[Civil No. 3956.   Filed April 18, 1938.]

[78 Pac. (2d) 490.]

D. W. WADDELL, Appellant, v. ELVIN E. WHITE, Appellee.

Messrs. Gust, Rosenfeld, Divelbess, Robinette & Coolidge, for Appellant.

Messrs. Woolf & Shute, for Appellee.

LOCKWOOD, J.—This is an appeal from a judgment in favor of Elvin E. White, hereinafter called plaintiff, against D. W. Waddell, hereinafter called defendant, for the sum of $8,000. The undisputed facts leading up to the action, as they appear from the record, may be stated as follows:

The Arizona Citrus Land Company, hereinafter called the company, is an Arizona corporation which

owns a considerable acreage of undeveloped land in the Beardsley project, situated west of the Agua Fria River. Defendant is, and has been for some time, the president of the company and the owner of a majority of its outstanding stock. On October 29, 1932, plaintiff was the owner of a considerable amount of citrus nursery stock and some equipment for caring for the same, and had had considerable experience in the growing of citrus trees. On that date he and the company entered into a contract which recited the following inducements thereto: The company desired to sell a certain portion of section 11, township 3 north, range 2 east, Gila and Salt River base and meridian, for the purpose of having it planted to Marsh seedless grapefruit, and the plaintiff desired to contract with the prospective purchasers of said land for its planting, care, and cultivation. The company therefore agreed that it would survey, plat, and set aside a part of section 11, and offer such lands for sale for $250 per acre, payable within ten years, with the stipulation that they should be planted to Marsh seedless grapefruit, and that prior to the 15th day of March, 1933, it would sell not less than 100 acres of the land so platted, or if such amount should not be sold and the purchasers· contract for the development thereof by plaintiff, as hereinafter provided, it would contract with plaintiff to develop sufficient of the company lands to bring the total of his contract for development to 100 acres. It further agreed that if any purchaser defaulted in his contract for development with plaintiff, it would try to resell the land to purchasers who would bring the payments under plaintiff's contract up to date, but in case such resale was not effected within six months, it would assume the contract and make the payments thereunder to plaintiff. In other words, the company guaranteed, on the conditions set forth below, that plaintiff should secure con-

tracts for the planting, care and development of at least 100 acres of land in Marsh seedless grapefruit, while the plaintiff agreed that he would provide sufficient grapefruit trees of suitable quality for the planting, and would contract with any person who purchased the land, and desired him to do so, for the planting, care, cultivation, irrigation, and fertilization thereof, up to the 31st day of March, 1936, for the sum of $180 per acre, which presumably was to cover the planting and care for the first year, and $75.24 per acre for its care the second year, and $75.72 per acre for the third year. These payments were to be made in equal monthly installments over the particular year for which they ran. There were other conditions in the agreement to which it is not necessary for us to refer.

It will be seen that the parties contemplated by this agreement that the company should furnish its land and secure purchasers therefor, and would guarantee that plaintiff should have the planting, care, and cultivation of at least 100 acres thereof, either by contract with the company itself or with purchasers of such land, for three years at the price above set forth. The company was under no obligation to make any payments to plaintiff except in case it did not find purchasers who would contract with him for the care of their land, as aforesaid, up to the extent of 100 acres, but it was bound to see that he secured at least 100 acres to care for in the manner above described. Immediately after the signing of the agreement, the parties, without any further written agreement, proceeded to prepare the land for planting. This work was done under the supervision of plaintiff, and certain equipment owned by him was used in the work, but all of the money expended in such preparation, such as labor and rental hire for additional equipment, was paid by the company and charged in its books as against the

future receipts that plaintiff expected to secure under his contract for the planting and cultivation of the 100 acres aforesaid. The land was not sold as expected, and on April 7, 1933, the parties entered into a supplemental agreement, reciting the original agreement and the failure to sell the lands, together with the advancement by the company of the money to cover the preparing of the land for planting, and that plaintiff desired to sell citrus stock in excess of the quantity required to plant 100 acres. The supplemental agreement then provided that the company agreed to advance such money as might be necessary to cover the actual expense of the planting of 200 acres, not in excess of $6,000, and to advance the necessary cost of cultivation of such 200 acres, not exceeding $900 per month for three years, or until it could be sold. Plaintiff agreed to waive any payments required to be made by the company until the land should be sold, but in no case later than three years after its planting. He also assigned to the company any moneys due by virtue of the contract, as provided in the original agreement, until all advances made by the company on account of the improvement of the 200 acres should have been repaid. About the time this supplemental agreement was under discussion, the parties began to discuss the planting of 100 acres which were owned by defendant personally, as it was believed that the setting out of citrus on his personal lands would stimulate the sale of the company land. In April, before defendant left for New York, a proposition for the planting of his personal land was made to him by plaintiff. The terms of this proposition are in dispute, defendant claiming one thing and plaintiff another, and we shall discuss it in detail later in this opinion. The parties did not reach an agreement immediately, but shortly after defendant went to New York he instructed plaintiff by letter to go ahead with

the proposition, not on the 100 acres of his personal land, but on 65 of that, and 30 acres which belonged to the company which defendant thought would be purchased by his brother at a later time. Shortly thereafter, plaintiff went ahead and planted citrus trees on approximately 200 acres of section 11, under the terms of the original agreement as modified by the supplemental agreement. The company paid all the expenses of the planting, in accordance with the terms of the agreement, and allowed plaintiff $150 per month for his personal expenses. All of these expenditures were carried by the company on its books as charges against the future receipts expected to be secured by plaintiff under the terms of his contract, as were certain bills that plaintiff owed which were assumed and paid by the company. Plaintiff also proceeded to prepare and plant the 95 acres included in his contract with defendant personally. The expense in planting these 95 acres was taken care of in exactly the same manner, as far as plaintiff was concerned, as the planting of the 200 acres in section 11; plaintiff reporting the expenditures on the 95 acres to defendant, and making no segregation between the 30 acres which belonged to the company and the 65 acres which belonged to defendant personally. He planted on defendant's land 1,520 grapefruit trees of a special variety, for which he was not paid, and the remainder of the trees on the 95 acres was purchased from a nursery company at 25 cents each; defendant assuming the payment therefor. Defendant returned from New York in June, 1933, and found the work substantially completed. Plaintiff continued caring for the company's property in section 11, and the 95 acres which were planted under his agreement with defendant personally, until the 20th of September, 1933. About that time plaintiff, defendant, and one Brown, who was secretary of the company, organized the

Agua Fria Citrus Grove Development Company, which we shall hereafter call the development company. Stock in it was issued in the approximate proportions of one-fourth each to plaintiff and Brown, and one-half to defendant. Thereafter, plaintiff assigned all of his interest in his two contracts with the company to the development company in exchange for the issuance to him of stock in the latter company. After the development company was organized, and about the 20th of September, 1933, plaintiff discontinued the care of all of the groves above referred to, and all of them were thenceforth cared for by the development company, under plaintiff's direction as manager; he receiving for his services as such manager a salary of $150 per month. The development company continued with the work until July 1, 1935, when it was dissolved by mutual agreement of the parties. In making a settlement, both plaintiff and Brown sold their stock holdings in the development company to defendant, receiving approximately $1,500 each for his stock. Thereafter, the company itself took care of all the groves; plaintiff receiving a salary of $200 per month for his work until the summer of 1936, when he ceased his employment, and shortly after this suit was filed.

The first amended complaint, on which the case went to trial, contained two causes of action. The gist of the first cause of action declared on reads as follows:

"II. That on or about the 7th day of April, 1933, in Maricopa County, Arizona, the defendant, D. W. Waddell, hired and employed plaintiff herein to prepare and plant for said defendant approximately sixty-five (65) acres of land in Section 26, Township 3 North, Range 2 West, to Marsh seedless grapefruit, said plaintiff to furnish all of the said trees for planting said acreage, and for which the said defendant then and there agreed to pay said plaintiff a reason-

able sum per tree, and under and by virtue of the same agreement said defendant agreed to pay the said plaintiff for preparing and planting the said acreage the sum of One Hundred Seventy-five Dollars ($175.00) per acre for the period of one year after the date of the said agreement, and thereafter as long as the said plaintiff maintained and cared for the said crop he was to receive Seventy-five Dollars and twenty-four cents ($75.24) per acre payable in equal monthly installments for the year ending June 1, 1935, all payable on or before April 7, 1936.

"III. That after the making of the aforesaid agreement plaintiff prepared the land hereinbefore described and planted thereon sixty-five (65) acres of Marsh seedless grapefruit consisting of 4,940 trees, of the reasonable value of One Dollar twenty-five ($1.25) per tree delivered upon the ground, or Six Thousand One Hundred Seventy-five Dollars ($6,-175.00) for the aforesaid trees, and the further sum of Eleven Thousand Three Hundred Seventy-five Dollars ($11,375.00) for preparing the ground, planting said trees and caring for said grove for the first year ending June 1, 1934.

"IV. That at the termination of the crop year, to-wit, about the first of June, 1934, said defendant withdrew the grove from the care and custody of the above named plaintiff and placed the custody and care thereof in the Agua Fria Citrus Grove Development Company, a corporation, and terminated the contract he had with the said plaintiff, who had earned thereunder the sum of Eleven Thousand Three Hundred Seventy-five Dollars ($11,375.00) and said defendant became indebted to the plaintiff for such work and labor the sum of Eleven Thousand Three Hundred Seventy-five Dollars ($11,375.00), payable as aforesaid."

The second cause of action is in the following language:

"I. That on or about the 7th day of April, 1933, in Maricopa County, Arizona, the defendant, W. D. Waddell, hired and employed the plaintiff herein to prepare and plant for said defendant approximately

sixty-five (65) acres of land in Section 26, Township 3 North, Range 2 West, to Marsh seedless grapefruit, to thereafter cultivate, irrigate and care for the said grove so planted as aforesaid, for which the said defendant agreed to pay a reasonable consideration for such work, trees and labor, Six Thousand One Hundred Seventy-five Dollars ($6,175.00) for said trees, and Eleven Thousand Three Hundred Seventy-five Dollars ($11,375.00) for preparing, planting and caring for the said grove for the period of one (1) year from the 7th day of April, 1933, to the 1st day of June, 1934.

"II. That said plaintiff did prepare and plant sixty-five (65) acres, as aforesaid, to Marsh seedless grapefruit, and thereafter did care for the said grove, cultivated, irrigated and improved the same until the 1st day of June, 1934, the reasonable value for the said trees and of the said work and labor, as aforesaid, being the sum of Seventeen Thousand Five Hundred Fifty Dollars ($17,550)."

The case came on for trial on the 25th of June, 1937, and the plaintiff offered considerable evidence, and rested. The minutes then show the following proceeding:

"The defendant moves that plaintiff be required to elect which cause of action he desires to proceed on. Plaintiff elects to proceed upon the second cause of action, or *quantum meruit.*"

The defendant then moved for an instructed verdict, which motion was overruled, and he then proceeded to put on his evidence, and both parties rested. Thereupon, counsel for the defendant again moved for a directed verdict, setting up various grounds therefor, and plaintiff moved to amend his complaint by inserting after the words "agreed to pay" in paragraph I of the second cause of action, the words "on or before April 7, 1936." The motion of plaintiff was granted, and the motion for a directed verdict was denied, and the case submitted to the jury which returned a ver-

dict in favor of plaintiff in the sum of $8,000. After the usual motions for new trial had been overruled, this appeal was taken.

■■ There are twelve assignments of error, setting up seven propositions of law which we shall consider in the manner which seems advisable. The first proposition is stated as follows:

"Where a contract has been partly performed and further performance is abandoned voluntarily by both of the parties, there can be no recovery for what has been done under the contract by either party, unless such right of recovery is reserved by the parties at the time when such abandonment takes place, either by express or implied agreement."

That this is a correct statement of the law is amply sustained by the authorities. *Juniper Lumber Co. v. Nelson, Inc.*, 133 Va. 146, 112 S. E. 564, 24 A. L. R. 247; *Ocean Accident & Guar. Corp. v. Meek*, 61 Utah 426, 215 Pac. 810; *Aderholt v. Wood*, 66 Cal. App. 666, 226 Pac. 950; 13 C. J. 603; 6 R. C. L. 943. Nor, indeed, does appellee question the abstract rule; his contention being that it does not apply to the facts of this case as shown by the pleadings, the evidence, and the issues upon which the case was tried. In order that we may ascertain whether the rule is applicable, it is necessary that we first determine what the agreement between the parties was as to the care of the land involved in this controversy. The parties differed as to its terms, but since the jury found in favor of the plaintiff, we must assume that the contract is of the nature testified to by plaintiff himself. We quote from his testimony as shown by the reporter's transcript, on direct examination, as follows:

"Q. What did Mr. Waddell say to you as nearly as you can remember about putting in his land or the 100 acres in section 26?

"A. He expressed a desire to have it planted during the spring season of 1933 and wondered if it would be possible for me to handle that the same as I was handling the tracts upon the Arizona Citrus Land Company holdings. . . .

"A. Particularly he wanted to take advantage of the supplemental contract of April 7th in which time he could have his grove planted and paid for under the conditions of that supplemental agreement. . . .

"Q. What was the time that he could take advantage of to have his grove planted?

"A. Three years period of time in which to pay for the trees which went on the piece of property. . . .

"A. He wanted to know that his planting would be done under the exact terms and conditions of this contract and this contract specified it should be done under the standards and grades of the Arizona Citrus Nurseryman's Association. It was specifically understood that all trees that were planted there should be budded by Bumstead buds with the exception of a special block of trees which I had grown for my own personal planting; he was very anxious to take advantage of those trees for himself. . . .

"Q. Did you finally arrive at an understanding about these specially budded trees at any of these conversations?

"A. I did.

"Q. When was it?

"A. April 9, 1933.

"Q. Will you please tell us what that was?

"A. After discussing the price of the trees considerably I told Mr. Waddell I would rather give him the trees outright than to sell them at a sacrifice consideration. At that time we had discussed the cultural cost of his grove and what it would cost him to take care of it after it was planted; also we had discussed the cultural operations on a 40 acre unit lying to the south side of this tract of land which I expected to plant with Mr. Waddell and it was understood then he would give me the cultural care of this 40 acre unit lying to the south of his piece of property and I would give him 20 acres of these special trees which I had expressed a desire to value at not less than two dollars apiece for myself. . . .

"A. *I told him I would do it the exact duplicate of my contract with the Arizona Citrus Land Company.*" (Italics ours.)

On cross-examination he testified as follows:

"Q. Now then you and Mr. Waddell made a deal of your own with reference to some land that he personally owned about the same time?

"A. Yes sir. . . .

"Q. Now, were there more than two conversations with Mr. Waddell about that agreement?

"A. I am pretty sure there were two. . . .

"A. He asked then if I could plant his grove under the terms of this supplemental agreement, giving him three years' time for which to pay for the trees which were planted on his property. He expressed a desire to have cultivation— . . .

"A. . . . The discussion went on about the care and cultivation of this orchard in the south. I told him if I were given the cultivation of that unit lying to the south of his piece of property, I would make him an out and out present of those 1520 trees, and I would hold his cost down to the minimum of what my actual cost for gas, oil and labor and expenses ran to. . . .

"A. I told him I could plant his hundred acre unit. There was 1520 of those special trees which I would give him a gift of if he would give me the cultivation of this unit to the south of his piece of property, and I would try to cultivate his piece of land at about $175.00 a month, which actually covered the cost of gas, oil and the labor involved in it. . . .

"Q. Mr. White, during this conversation of April 9th, was it stated by Mr. Waddell that he desired you to put in this hundred acre tract under the terms that were provided in the agreement of October 29th, and as modified by the agreement of April 7th? . . .

"Q. He definitely stated to you that if he planted this piece of property, he would contract to you on those terms?

"A. Yes sir.

"Q. As set forth in the agreement of October 29th and as modified by the agreement of April 7th?

"A. Yes sir. . . .

"Q. So then you want us now to understand, that when you and Mr. Waddell parted company here on the 9th of April, 1933, it was agreed if you did go ahead you would go ahead on the basis of the agreement of October 29th, as modified by the agreement of April 7th, except that you agreed that in consideration of your giving him—no, that in consideration of his agreement to give you care for a year of the 40 acre tract there already set out, you would give him 1520 of your adjoining trees for nothing?

"A. Yes sir.

"Q. That was the agreement?

"A. Yes sir."

It appears from this testimony that it was definitely understood by plaintiff that he was to care for the land of defendant under the same terms as his original agreement with the company of October 29th, as modified by the supplemental agreement of April 7th, with the exception that if he were given the care for a year of 40 acres of other land belonging to the defendant, which was already set out, he would give defendant for nothing 1,520 of the trees to be used in planting the land. This contract was the one under which plaintiff claims he planted and cared for the 95 acres until September 20, 1933.

Applying the terms of the supplemental and original contracts with the company to the transaction between plaintiff and defendant personally, they clearly amount to this: The plaintiff was to provide 1,520 trees of a special variety, and the balance necessary to plant the 95 acres with No. 1 Marsh seedless grapefruit; he was to plant such trees on the 95 acres, and care for, cultivate, irrigate, and fertilize them for three years, for an agreed price of $180 per acre for the first year, $75.24 per acre for the second year, and $75.72 for the third year. The defendant was to advance such money as was necessary to cover the actual expense of preparing the land and digging, balling,

transporting, and planting the trees, and such money as should be necessary to cover the actual cost of care, cultivation, and fertilization of the ground for the three years. The remainder of the agreed price fixed for planting, care, and cultivation, as above, was not to be paid until three years after the planting, unless the land was sooner sold, in which case defendant guaranteed that plaintiff should continue the care thereof for the balance of the three years, receiving all payments due up to the time of sale from the defendant immediately, and the balance from the purchaser of the land in monthly installments, or, if the purchaser failed to keep such agreement, then from defendant. Plaintiff proceeded to plant the land as agreed upon in the spring of 1933, and to care for it until September 20, 1933, when, by mutual consent of the parties, the contract for further care was abandoned by plaintiff, and the work from that time on was done by the development company, of which plaintiff was the general manager under salary. The actual cost of the work to September 20, 1933, was paid by the company, but plaintiff received no compensation for his own labor, the use of his machinery, nor for the 1,520 trees which he had agreed to give defendant in return for the care of 40 acres of land which was already planted, as aforesaid. Plaintiff, however, was never given the care of that 40 acres.

We think it is evident that the original contract under which plaintiff was to perform the work on the 95 acres was one which could not be fully performed within the year, and if plaintiff had based his action on such contract, it would have been within the statute of frauds, since admittedly it was oral and not written, and no suit could have been maintained thereon unless it came within one of the exceptions to the statute. One of these exceptions is that if the contract had been fully performed by one of the par-

ties, then that party may bring an action on the contract against the other, without the necessity of showing a written contract. This exception, however, is not available to plaintiff, for the undisputed evidence shows that the contract was terminated on September 20, 1933, at which time, of course, neither party had fully performed his part thereof. Nor does the case of *Gold* v. *Killeen,* 44 Ariz. 29, 33 Pac. (2d) 595, 94 A. L. R. 448, apply, for by plaintiff's own testimony he acquiesced in the turning over of the work to the development company, took a job with that company which made it impossible for him to continue with his contract, and never intimated to defendant that he wished to continue under the contract.

Nor does the claim of plaintiff that the contract was severable in its nature better his situation. As a general rule it may be said that a contract is entire when, by its terms, nature, and purpose, it contemplates and intends that each of its parts and the consideration should be common each to the other and interdependent, while a severable contract is one which in its nature and purpose is susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by the contract which are not necessarily dependent upon each other, nor is it intended by the parties that they shall be. Primarily, the question of whether a contract is entire or severable is one of intention, which intention is to be determined by the language which the parties have used and the subject matter of the agreement. A contract may both in its nature and by its terms be severable, and yet rendered entire by the intention of the parties. We think that perhaps the best test is whether all of the things, as a whole, are of the essence of the contract. That is, if it appeared that the purpose was to take the whole or none, then the contract would be entire; otherwise, it

would be severable. *Wooten* v. *Walters,* 110 N. C. 251, 14 S. E. 734, 736. The divisibility of the subject matter, or the apportionment of the consideration, while they are both items to consider in determining whether a contract is entire or severable, are not conclusive.

Even assuming that the present contract may be considered as a severable one, it is obvious that the only points of severability are at the end of the first, second and third year, for it cannot be conceived that it was the intention of the parties to have contracted for a part of each year's care, and particularly for that of the first year, which involved the preparation of the land, and its planting, irrigation and cultivation for that period. Had plaintiff fully performed his agreement for the first year, which ran to March 1, 1934, it might perhaps be argued that such portion was severable from the second and third year care and cultivation, but the record shows, beyond question, that he did not do so. We think, therefore, that plaintiff is in the position of a man who has a contract which, whether it be entire or severable, has not been completed either as a whole or in one of its parts by either party. In such a case the general rule of law under discussion undoubtedly applies, and neither party may recover anything on the contract unless it appears expressly or impliedly that a right of recovery for that portion of the contract which had already been performed, was reserved by mutual agreement. There is nothing in the record to show that there was an express agreement that plaintiff was entitled to recover anything for the partial performance of even the severable portion of the contract. But, assuming that there was an implied understanding to that effect, such right of recovery would accrue at the time the contract was terminated, to wit, September 20, 1933, and since such an agreement was not in writing, the statute of limitations had run

against it before the commencement of this action. Plaintiff could not, therefore, recover on the basis of the contract to which he testified. If it were not severable, he would be barred both by the statute of frauds and by the statute of limitations. If it be severable, while the statute of frauds would not apply to the severable portion, the statute of limitations would, for the contract was never performed, and the action would necessarily have to be for a breach thereof, the right of action commencing at the time of the breach. Plaintiff apparently recognized this difficulty during the trial of the case, for he presented his evidence, not on the theory that he was to receive $180 per acre for all of the work which he was required to do during the first year, including the furnishing of the trees, but on the theory that he was to be compensated on the basis of the reasonable value of the work done and material furnished. That this is true is shown by his election, when defendant moved that he be required to choose between his first and second causes of action, for he not only chose the second cause, which was perhaps ambiguous in its language, but expressly stated that he sought to recover on a *quantum meruit*. He discovered at the close of the case, though, if his suit was based on a true *quantum meruit,* that the statute of limitations had run against his action, and, therefore, asked leave to amend by inserting in his complaint the allegation that the agreement was that he was to be paid the reasonable value of the labor and material furnished, but that such payment was to be deferred for three years; this last allegation obviously being inserted for the sole purpose of taking the case out of the statute of limitations. The difficulty in sustaining a recovery on the basis of the amended complaint is that the testimony of plaintiff himself expressly repudiates any such agreement between the parties. His testimony is positive and emphatic that

he was to be paid a fixed price for his services and material, to wit, $180 per acre for the preparing, furnishing the trees, and cultivating and caring for them up to March 1, 1934, and the equal fixed price of $75.24 and $75.72 per acre for the respective two succeeding years, and not that he was to be paid for the reasonable value of the trees and labor. The payment, it is true, was to be divided into two portions; the actual cost being advanced by the defendant, and the balance, which was the difference between the actual cost and the fixed price per acre, to be deferred for three years. There was nothing in the record which would permit the case to go to the jury on the theory of a contract for the reasonable value, payable at the end of three years. If plaintiff's case was based on the theory that there had been a breach of the contract and that he was, therefore, entitled to recover the reasonable value of what he had done, the three-year period did not apply, and his compensation was due upon the breach. If, on the other hand, his theory is now that he is recovering on a severable contract for the reasonable value of the work to be done in one year and paid at the end of three years, the reply is that there is no testimony that such a contract was ever executed. The instructions given by the trial court to the jury submitted the case on the theory that there was an agreement between the parties that defendant was to pay plaintiff a reasonable sum for the preparation, planting, and cultivation of the land in question until the 1st of June, 1934, the payment to be made in three years, but that, although the plaintiff only cared for the grove until at the most the 1st of October, 1933, he was entitled to recover for the reasonable value of his services to that date. There is no evidence of such an agreement, and if there were, since it was breached before performance, the statute of limitations had run against a recovery on *quantum meruit*.

There is no need for us to discuss the other questions raised by the assignments of error. We think the verdict and the judgment cannot be sustained on any theory of the case consistent with the pleadings, the evidence, and the law applicable thereto.

The judgment of the trial court is reversed, and the case remanded, with instructions to proceed in accordance with the rule expressed herein.

McALISTER, C. J., and ROSS, J., concur.