[Civil No. 3736.   Filed March 22, 1937.]

[66 Pac. (2d) 238.]

LOIS GRUNOW MEMORIAL CLINIC, a Corporation, Appellant, v. DAVID M. DAVIS, Appellee.

Mr. H. S. McCluskey, Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant.

Messrs. Moore & Shimmel, for Appellee.

LOCKWOOD, J.—This is an appeal by Lois Grunow Memorial Clinic, a corporation, hereinafter called defendant, from a judgment in favor of David M.

Davis, hereinafter called plaintiff. The complaint sets up, in substance, the following cause of action: Plaintiff, a practicing physician, was asked by defendant to move with his family from Baltimore, Maryland, to Phoenix, Arizona, and to become a member of the medical staff of defendant. In consideration thereof and of the service to be rendered by plaintiff in connection with the defendant, the latter, together with W. O. Sweek and W. C. Grunow individually, guaranteed that they would pay to plaintiff such sum as his professional income during the year 1931 fell short of $12,000. It was further alleged that plaintiff accepted said offer and did remove to Phoenix and carry out his terms of the agreement aforesaid, and that his professional income during the year 1931 fell short of the guaranteed sum by $2,655.62; that demand had been made for the payment of such deficiency, but that it had been refused. The case was tried to the court sitting without a jury, and judgment was rendered in favor of plaintiff for the sum sued for, with interest, as against the defendant corporation only, whereupon the latter has appealed to this court.

There are some eleven assignments of error, but we think the case may be determined upon a consideration of the first and second conclusions of law filed by the trial court, which read as follows:

"1. That in his negotiations, in person and by correspondence, with plaintiff, defendant William O. Sweek acted as the agent of defendant Lois Grunow Memorial Clinic, a corporation, by express authorization of the resolution of July 8, 1930, and by implication from all the surrounding facts and circumstances.

"2. That the letters and telegrams comprising Plaintiff's Exhibits A to H, inclusive, and K, and Defendant's Exhibit 1 in evidence, constituted a contract by and between plaintiff and defendant Lois Grunow Memorial Clinic, a corporation, by the terms of which plaintiff agreed on or about January 1, 1931, to move

from Balitimore to Phoenix and become a member of the staff of said Clinic, and defendant Lois Grunow Memorial Clinic, a corporation, agreed, in consideration of plaintiff's move and his services to be rendered to and in connection with said clinic, to pay plaintiff $12,000.00 per year, or such part thereof as should exceed plaintiff's professional income."

Most of the facts shown by the evidence are not in serious dispute, but since the findings of the trial court in many respects are not of ultimate facts but merely refer to various portions of the evidence appearing in the record, we state the facts as shown by such record in consecutive form and more fully than shown by the findings, accepting the latter of course where there may be any dispute in the evidence as to such ultimate facts.  So stated, the factual situation presented by the record is as follows.

At some time prior to July 8, 1930, Dr. William O. Sweek, then and now one of the leading surgeons of Phoenix, Arizona, conceived the idea that it would be in the interest of the practice of medicine in Phoenix if certain physicians, specialists in their branches of the profession, would associate themselves in a voluntary organization, commonly called a "clinic," whereby they might be of mutual advice and assistance to each other and to any patients which any of the members of the clinic might serve.  William C. Grunow, the other individual defendant, was a wealthy business man whose interests were centered in Chicago, but who spent part of his winters in the Salt River Valley.  Dr. Sweek brought the question of the establishment of a clinic of the nature above described to the attention of Mr. Grunow, and the latter approved highly of the idea.  The matter was discussed with a number of practicing physicians in Phoenix, and Mr. Grunow agreed, in substance, that he would cause a corporation to be organized and furnish it the

funds to erect a suitable building, properly equipped, wherein the doctors who were to be members of the voluntary association of the type above described, and which we shall hereafter refer to as the clinic as distinct from the corporation, might have their offices, paying therefor a suitable rental. In pursuance of this idea, the defendant was organized as a corporation on the 17th of April, 1930; the incorporators being Dr. Sweek and Mr. Grunow. The powers given it were very broad in their details, but it was clearly apparent from its charter that it was not organized for profit. The entire control of the corporation was originally in the hands of the two incorporators, and no additional members might be added without their consent. As a matter of fact, during all the times during which it is claimed the cause of action arose these two incorporators were the only members of the corporation defendant, and its only officers and directors. Shortly after the incorporation, the board of directors adopted the following resolution:

"Resolved: That Director W. O. Sweek be and is hereby authorized to enter into agreements, contracts, or leases on behalf of the corporation with practitioners of the medical profession for space in the Lois Grunow Memorial Clinic, said agreements, contracts, or leases may be for indefinite periods or for a term of years, and may contain a clause for cancellation for good cause shown."

So far as the records show, this was the only act of the board authorizing any person to act as agent of the corporation.

In order to carry out the organization of the clinic along the lines which had been discussed, Dr. Sweek corresponded with a number of the leading medical organizations of the United States to find out if they knew of specialists in the various branches of medicine who would like to come to Phoenix and join the

clinic. Among those whom he contacted was plaintiff, then a member of the staff of Johns Hopkins University, who was a specialist in the department of urology. Between July 30 and October 29, 1930, various letters and telegrams passed between Dr. Sweek and plaintiff. In Dr. Sweek's letter of August 4th to Dr. Davis, he replied very fully to many questions asked by Dr. Davis in his letter of July 30th, and in September Dr. Davis made a personal trip to Phoenix to make a thorough investigation into the situation. After his return to Baltimore, he received a telegram from Dr. Sweek, urging that he make up his mind as to whether he would join the clinic. On October 13th, Dr. Davis sent the following telegram to Dr. Sweek: "Accept with conditions please do not announce yet letter explains."

The letters referred to in the telegram contained the following conditions:

"I have however decided to go to Phoenix, making only two conditions which I hope and believe will be acceptable. I have been moved to this decision by the prospects at Phoenix, which I consider good, by the excellent facilities which will be available at the Grunow Memorial, by the desirable associations which I believe will be found there and by the climatic advantages of which I wish my family to have the benefit.

"In going so far, however, I have a natural desire to insure myself and my family as far as possible against any untoward combination of circumstances. I hope therefore that it will be possible for the Clinic to guarantee me $12,000.00 a year for two years. This sum seems appropriate, as it will enable me to live and meet the heavy expenses of moving, and yet is not so large as to remove any of the incentive to hard work. In addition I hope that the Clinic would be willing in case of necessity and during these first two years, to assist me by loans in financing the purchase of particularly expensive instruments. It is quite possible that this would never be necessary.

"Should the above conditions be acceptable, I desire to throw myself at once heartily and enthusiastically into every line of effort which will in any way further the work of the Clinic."

The specific condition on which this suit is based is as follows: "I hope therefore that it will be possible for the Clinic to guarantee me $12,000.00 a year for two years." On October 17th, Dr. Sweek replied to this letter saying, in part, as follows:

"In regard to the guarantee of the $12,000.00 a year, that is really a stumbling block, not because we haven't sufficient funds, and not because I personally would not be willing to guarantee it out of my own private income and split with you the profits that go over $10,000.00—I think I could make $10,000.00 or $15,000.00 for myself in the next two years — but I will have to consult with Mr. McCluskey, the attorney for the corporation and find out whether I can enter into such an agreement.

"I am under the impression that by reason of our state law here and the charter under which the institution operates, that I would have to pay you a straight salary for these two years and turn over to the corporation all that you earn above that fee. This is a tax exempt institution operating without profit, and from which no one can derive a profit. We can pay salaries and can enter into other contracts, but I would hesitate to put in writing such a guarantee without consulting Mr. McCluskey who is away and will not be back until Monday or Tuesday. After I have talked with him, I will write you in detail. . . .

"To come down here on my personal guarantee to make up any deficit that you may need for the first two or three years, would you be willing? . . .

"I would not under the circumstances enter into an agreement with any other man, nor would I want your situation told to anybody in Baltimore, among your colleagues, Finn Young, or anyone else. This information might go back to Franklin Martin of Chicago, through these men, and would immediately go back through Mr. Grunow's chief surgeon to the other men in the building, or it might get out through some other

channel. This would not be put out intentionally, but would be done thoughtlessly and therefore, I don't want your deal and mine to be promulgated around to the men, because no man is going into that institution with a guarantee and I will have to consult with our attorney before I can let you know definitely.''

On October 29th, Dr. Sweek wired Dr. Davis as follows: ''My wire should read accept terms your letter answer.'' To this Dr. Davis answered on the 30th, in the following language: ''Okay I am delighted.''

■ The first question before us is whether the correspondence above referred to constitutes a written contract. It seems to us that there can be little doubt that it does. Dr. Sweek requested Dr. Davis to join the staff of the clinic. Dr. Davis, after careful investigation, wrote accepting the offer on two conditions. Dr. Sweek answered accepting the terms set forth in Dr. Davis' letter, and Dr. Davis immediately replied: ''Okay, I am delighted.'' We think that this constitutes an agreement of the nature set forth in plaintiff's complaint, to wit, that the defendant would pay Dr. Davis any difference between the sum of $12,000 and the amount collected by the latter as fees during the year 1931.

■ The second question is whether Dr. Sweek had the authority to bind the defendant by such a contract. It is elementary, of course, that a corporation acts only through its agents, and it is also beyond question that an agent may only bind a principal within the scope of his authority, actual or apparent. No citations are necessary to support these fundamental principles of law. As a corollary to these principles, it is generally accepted that when one deals with a known agent, he must exercise due caution in ascertaining whether the agent is acting within the scope of his authority, if he wishes to bind the principal. As

was said in *Brutinel* v. *Nygren,* 17 Ariz. 491, 154 Pac. 1042, 1045, L. R. A. 1918F 713:

"The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and like a railroad crossing suggests the duty to 'stop, look, and listen,' and if he would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority, and in case either is controverted the burden of proof is upon him to establish it. In fine, he must exercise due care and caution in the premises.

" ' . . . Unusual and unnatural acts are not to be tolerated, strained constructions are to be avoided, inferences of facts are to be limited to those which are reasonable, natural and ordinary, and, as has been so often pointed out, inferences are to be drawn only from facts for which the principal is responsible, and not from mere considerations of convenience or policy. The mere fact that one is found to be a general agent justifies neither the court nor jury in guessing that given acts are within the scope of his authority.' "

The authority of an agent may be either direct or implied. Direct authority exists only when the principal has definitely and specifically authorized the agent to perform the act in question, but when the rights of third persons are concerned, the law sometimes implies the authority of the agent, although no direct authority has been given the latter, and in some circumstances even though the authority has been expressly refused by the principal. The test in cases where implied authority is relied upon is whether, *under all the circumstances of the particular case,* the party relying on such authority acted as a reasonable and prudent man who knows that he is dealing with an agent, in ascertaining the extent of the authority of that agent. Plaintiff in the present case relies upon both express and implied authority, the express authority being the resolution above set forth. In considering this resolution, it must be remembered that at

the time of the making of the contract it does not appear that plaintiff had any knowledge of the resolution referred to. He cannot, therefore, claim that he was misled thereby, the question being as to the actual, and not the apparent, authority conferred by the resolution.

In view of the undisputed evidence appearing in the record that the original purpose of the defendant was merely to provide suitable quarters which the members of the clinic might rent at a fixed price for the purpose of carrying on their practice, and that it was not its intent nor practice to maintain a hospital, nor to hire physicians generally to work for it and under its instructions and control, we are of the opinion that it appears affirmatively from the record that the resolution above referred to was not intended to and did not confer direct authority upon Dr. Sweek to employ any member of the clinic, much less to guarantee a fixed remuneration to such members.

We come then to the question of implied authority. We think the record sustains the conclusion that Dr. Sweek occupied a position analogous to that of general manager of the defendant, and that he, therefore, had implied authority to bind the corporation to the extent that a general manager of a corporation of the character of defendant, and actually or ostensibly engaged in the business which the defendant was engaged in, would have. What is the authority of the general manager of a corporation? The usual language of the text-writers is that a general manager has the power to do anything which the corporation itself might do. On examining the cases, however, we think that this statement of the powers of a general manager is too broad, and that the better authorities hold that his authority is limited to that which is usual and necessary *in the ordinary course of*

*the business actually followed by the corporation,* and not to extraordinary powers conferred, indeed, upon the corporation by its charter and which may be exercised by its board of directors, but outside the scope and purpose of the business of the corporation as actually carried on. We think the confusion has arisen to a great extent from the difference in the powers granted corporations by their charters in past and in modern times. Most corporations organized many years ago were limited in their powers as set forth in their charter to the particular business in which they actually intended to engage and those things naturally correlative thereto. The charter powers and the actual operations of the corporation coincided and it was quite proper to say in general language that the manager could do anything which the corporation itself could do. But of more recent times, for some reason, the charters of corporations organized under general statutes usually attempt to include the right to do everything which a private individual can do, and many things which he cannot, although the incorporators have no intention of ever exercising a tithe of the powers conferred by the charter, and as a matter of fact limit their activities to one or two of those powers. Under such circumstances, language quite appropriate to the older charters becomes wholly inappropriate when applied to the later ones. In the case of *Caddy Oil Co.* v. *Sommer,* 186 Ky. 843, 218 S. W. 288, 290, the difference is pointed out in the following language:

"Hence, in determining whether an officer or other agent of a corporation has been vested with binding authority by the corporation to act for it in a matter, there must be express authority found for the action of the officer in the by-laws, resolutions, or acts of the board of directors, or else the act must appear within the scope of the apparent authority with which the board of directors has invested him, by the man-

ner in which the officer has been permitted by it, with knowledge and approval of or acquiescence in his acts, in the transaction of its business. *This apparent authority is, however, limited and governed by the character of business in which the corporation is engaged.* These principles are sustained, as we think, by the following authorities: *Star Mills* v. *Bailey,* 140 Ky. [194] 196, 130 S. W. 1077, 140 Am. St. Rep. 370; *Mt. Sterling, etc.,* v. *Looney,* 1 Metc. 550, 71 Am. Dec. 491; *Frankfort Bridge Co.* v. *Frankfort,* 18 B. Mon. 41; *Lee* v. *Flemingsburg,* 7 Dana, 28; *Commercial Bank, etc.,* 1 B. Mon. [13] 14, 35 Am. Dec. 171; 7 R. C. L. 624, 625, 626; *Elk Valley Coal Co.* v. *Thompson,* 150 Ky. 614, 150 S. W. 817; 2 Cook on Corporations, § 719; 2 Thompson on Corporations, § 1578; *Mason, etc.,* v. *Metcalfe Mfg. Co.,* 44 S. W. 629, 19 Ky. Law Rep. 1864; *Bastin* v. *Givens' Adm'x.,* 170 Ky. 201, 185 S. W. 835.'' (Italics ours.)

In the case of *Trephagen* v. *City of South Omaha,* 69 Neb. 577, 96 N. W. 248, 250, 111 Am. St. Rep. 570, the court said:

"It is true that a corporation can act only by its agents, and the presumption is that an act pertaining to its ordinary business, when performed by its president, secretary, or general manager, is legally done, and is binding upon the corporation, yet no such presumption prevails when the act done by such officers does not fall within the scope of the powers conferred upon and usually exercised by them as part of the ordinary business of the corporation. The act of signing the name of a corporation to a petition for the opening of a highway over its real property, or the paving of a street abutting thereon, whereby a special tax will be assessed and become a charge against the property of the corporation, is one which falls within the managing powers of the board of directors, who are by law and by the articles of incorporation in this case made the managing agents of the corporation; and authority to perform such an act must come from them."

What was the duty of the plaintiff as a reasonable and prudent man, *under all the circumstances*

*of the present case,* in ascertaining how far the authority of Dr. Sweek extended? He had had an extensive correspondence with Dr. Sweek in regard to the general nature and purposes of the institution, and had even made a special visit to Phoenix to investigate the situation. He knew that the defendant was not organized for the purpose of making a profit but, in substance, was a charitable institution whose real purpose was the encouragement of a voluntary clinic of physicians to improve the practice of medicine in Phoenix. He also knew that in so doing it was not the intention of defendant to conduct a hospital manned by a staff of paid assistants and physicians, so that if there were a profit the defendant would receive it, and if there were a loss it would sustain it, but that its activities were to be confined substantially to the furnishing of a suitably equipped building where the voluntary organization might maintain its offices, and that any net income received by the corporation from the rental of such offices (practically its sole source of revenue) was to be used for medical research. He also knew it was not the intention of the defendant to guarantee incomes generally to the members of the clinic; that Dr. Sweek had grave doubts of his legal right to make such a guaranty and refused to do so until he had consulted with the legal advisor of the defendant. Certainly all these facts were sufficient to cause a reasonable man, who expected to base his action upon a requested guaranty, to inquire fully into the authority of the person actually making the guarantee to bind defendant. Under all these circumstances, he made no investigation of Dr. Sweek's authority but accepted the latter's telegram as satisfactory proof that he did have it. The question then is: May one dealing with an agent, with all the danger signals above described apparent to him, accept the

agent's own declaration as to the extent of his authority? The general rule is stated in Restatement, Law of Agency, paragraph 285, as follows:

"Evidence of a statement by an agent concerning the existence or extent of his authority is not admissible against the principal to prove its existence or extent, unless it appears by other evidence that the making of such statement was within the authority of the agent or, as to persons dealing with the agent, within the apparent authority or other power of the agent."

We think that in view of all the circumstances of the case, the statement of Dr. Sweek in his telegram of October 29th, accepting the conditions laid down by Dr. Davis, was not sufficient to establish such authority, and as a corollary it was not sufficient to justify plaintiff in his failure to make any further investigation on that point. Dr. Sweek himself took the stand, both for cross-examination under the statute and on defendant's case in chief. His testimony shows clearly that he never had, nor considered that he had, authority to bind the defendant without the consent of the other incorporator and director, Mr. Grunow; that he took the matter of the guaranty up with the latter and secured from him permission to make a guaranty of a kind very different from that asked by Dr. Davis, in that it was conditioned upon defendant's making a profit from its receipts, and the evidence shows clearly that such profit was not made. Dr. Sweek testified that he notified Dr. Davis of this limitation; Dr. Davis denied receiving any notice thereof until long after the year 1931; and we must assume, for the purpose of this case and in harmony with the implied findings of the trial court, that Dr. Davis is correct in his statement. Under these circumstances, since Dr. Sweek had no authority, direct nor implied, to bind defendant by the contract he made,

the only theory upon which plaintiff can successfully maintain that defendant is liable on the contract is that while Dr. Sweek did not have the authority to bind defendant, the latter ratified the contract by its conduct. It is true that it might have ratified the unauthorized act of Dr. Sweek, but ratification of the unauthorized acts of an agent must be made with full knowledge of all the facts by the principal. The only reasonable conclusion from the evidence in the case is that defendant believed that Dr. Davis came out to Phoenix under the conditional guaranty above referred to, dependent upon the earnings of the former, and that it had no knowledge that plaintiff relied upon an unconditional guaranty until after the relations between the two had been severed at the end of the year 1931.

In view of what we have said, it is unnecessary that we should discuss the other questions raised by the appeal, though we have considered them. We have no doubt that plaintiff acted in good faith all through the proceedings, and that he removed his office to Phoenix, relying upon the statements of Dr. Sweek, and believing that he had an unconditional guaranty from the defendant. As we have pointed out, this is not true, but under the law he was not without remedy. When an agent makes a contract ostensibly on behalf of a disclosed principal, without sufficient authority to do so, it is the agent and not the principal who is liable upon such contract, and in the present case plaintiff's remedy was against Dr. Sweek and not as against the defendant corporation.

The judgment of the superior court is reversed, and the case remanded with instructions to enter judgment in favor of defendant.

McALISTER, C. J., and ROSS, J., concur.