435 P.2d 838

**LAND–AIR, INC., a corporation, Appellant,**
v.
**J. Norman PARKER and Western Baptist Hospital Association, an Arizona non-profit corporation, Appellee.**

No. 8927–PR.

Supreme Court of Arizona,
In Banc.

Dec. 15, 1967.

Rehearing Denied Jan. 23, 1968.

Thayer C. Lindauer, Phoenix, for appellant.

John E. Savoy, Hill, Savoy & Flickinger, Phoenix, for appellee Western Baptist Hospital Association.

James J. Cox, Jr., Cox & Hedberg, Phoenix, for appellee J. Norman Parker.

McFARLAND, Vice Chief Justice:

Petitioners, Dr. J. Norman Parker and Western Baptist Hospital Association, who were appellee-defendants, petitioned for review of the Court of Appeals decision (Land-Air, Inc. v. J. Norman Parker and Western Baptist Hospital Association, 4 Ariz.App. 395, 420 P.2d 967), which reversed a Superior Court of Maricopa County judgment rendered in their favor. We granted the petition for review.

Land-Air, Inc., plaintiff in the trial court and respondent herein, hereinafter referred to as Land-Air, brought this action to replevy equipment under the contracts executed by petitioner-defendant Dr. J. Norman Parker, hereinafter designated as Parker, or, in the alternative, for damages and attorneys' fees. Parker admitted the execution of the contracts, but denied that he was present owner of the equipment and denied liability on the ground that the conditional sales contracts were cancelled, terminated, and novated by a refinancing agreement. At the pre-trial hearing, upon stipulation by the parties, it was agreed that one issue would be tried—i. e., whether the conditional sales contracts between Land-Air as assignee and Parker had been cancelled and

novated by reason of a subsequent agreement. The trial court heard the cause without a jury, and granted judgment for Parker and Baptist Hospital. From that judgment Land-Air appealed to the Court of Appeals, which reversed in favor of Land-Air.

Land-Air is a manufacturer and distributor of X-ray equipment. One of its X-ray machines and additional equipment were sold to Parker by Allied Medical Supply, hereinafter designated Allied, a retailer handling some of Land-Air's products. Parker, an osteopathic physician, made a down payment on the purchase and executed two conditional sales contracts covering the balance due. Allied assigned these contracts in turn to Land-Air, assignee, who retained a right of recourse against Allied. Due notice of the assignment was given to Parker.

The principal question in this case is whether Allied was an agent of Land-Air, with authority to cancel the conditional sales contracts between Parker and Land-Air as assignee and enter into novation. This court has set forth four conditions under which agency could be proved.

1. By direct evidence of an express contract of agency between principal and agent.

2. Proof of facts which raise the implication of such a contract—agency does not have to be proved by direct testimony; it may be proved as any other fact and may be established from other circumstances such as relation of the parties to each other and to the subject matter.

3. By ratification.

4. By estoppel.

Bristol v. Moser, 55 Ariz. 185, 99 P.2d 706; Litchfield v. Green, 43 Ariz. 509, 33 P.2d 290; Little v. Brown, 40 Ariz. 206, 11 P.2d 610. The question then in the instant case is whether the facts prove agency under any of these principles of law.

If Parker is to establish agency, it may be shown by the facts and circumstances of the relationship of the parties under No. 2 above. The lower court found from facts and circumstances presented that Allied was the agent of Land-Air with authority to enter into a novation of the contracts. Under established principles of appellate procedure, we must affirm the trial court if "we can on any reasonable view of the evidence deduce therefrom facts which, on any theory of the law, would sustain the judgment." Colvin v. Superior Equipment Co., 96 Ariz. 113, 392 P.2d 778; Babbitt & Cowden Livestock Co. v. Hooker, 28 Ariz. 263, 236 P. 722.

Parker entered into the conditional sales contracts with Allied, a New Mexico corporation, for the purchase of the equipment in question. On September 23, 1959, Allied assigned and transferred the contracts to Land-Air, with recourse. Parker acknowledged notification of the assignment, which acknowledgment was dated September 21, 1959. In May 1961 Parker became delinquent in the payments under the contracts.

Parker failed to make subsequent payments on the contracts despite several letters from Land-Air asking him to do so. As a result, Land-Air then contacted Allied, its dealer, in hopes that something could be done to get Parker to make the overdue payments. The matter came to the attention of James E. Hare at Allied who, in turn, met with Parker.

Because Parker contended that he was unable to make the payments, Hare conceived of an arrangement whereby the equipment in question, without being removed from Parker's office, could be sold to Nationwide Leasing Co., which in turn would lease the equipment back to Parker. Both Parker and Nationwide agreed to this arrangement. Hare, who received $6,344.80 from Nationwide as the "purchase" price, then conveniently disappeared, while Allied became defunct.

Sometime after the sale and lease-with-an-option-to-purchase agreement between Nationwide and Parker, Nationwide, as assignor, assigned its interest to Exchange National Bank. Parker made payments under his agreement with Nationwide until August 1962, when his lease-option-to-pur-

chase was assumed by the Children's Osteopathic Hospital, with the approval of Exchange National Bank, the assignee of Nationwide, under an assumption agreement wherein the Children's Hospital agreed to pay the obligations under the lease agreement. Thereafter the equipment was moved to the Children's Hospital in Phoenix, Arizona. Subsequent thereto, the Children's Hospital defaulted under its contract, and Exchange National Bank then brought suit against Parker and Children's Hospital to recover the equipment, and also instituted suit against Parker for a deficiency which had been paid in full by Parker at the time of the trial below. The other defendant in the instant case, Western Baptist Hospital Association, then acquired possession of the equipment. No demand was made upon Parker by Land-Air from the completion of these transactions with Allied and Nationwide from June 15, 1961, until a few days before the original complaint was filed in September 1962—a period of over fourteen months.

Edward H. Jackson, credit manager for Land-Air, testified, in part, as follows:

"A There is a differentiation between a follow up of an accounts receivable and a follow up of an assigned contract. After a certain period of time on an assigned contract where a letter or two has not brought any results it is then referred back to the dealer.

"Q And you expect the dealer to make the collection for you?

"A Not for me, he either collects it or settles the account in order to avoid his having to repurchase the equipment or contract.

"Q He collects the account or settles it so that he's not going to have to rebuy it back from you?

"A That's right.

"Q But he did these things while you were the owner of the account? Let me be specific; in this case you did not reassign this contract to Allied Medical, did you?

"A No, it's not the practice as a rule to immediately reassign it then you'd be going back and forth.

"A [sic.] You went back to the dealer who was Allied Medical and told them that either collect the account or settle the account or you were going to go back on them on this recourse, is that right?

"A That's correct.

\* \* \* \* \* \*

"Q So your testimony is that of February 20, 1961, or perhaps prior to that time, you went back to Allied Medical Supply and told Allied Medical Supply either to collect this account or settle it or they were going to have to pay it, isn't that right?

"A I did not use the term 'collect'. I used—

"Q —didn't you just testify to that?

"A I don't believe I used the word 'collect', no.

"Q That's not your testimony, is that right?

"A The basis around whether you use the word collect or not, actually what we tell them to do is obtain payment from them and under a contract we ask them to obtain payment from them.

"Q Obtain payment or settlement, wasn't that your testimony a minute ago?

"A That's right, or they have to settle it themselves, because—

"Q —If they have to settle it themselves it becomes an account they owe you, isn't that right?

"A We would not release the papers naturally until we were paid for them, that's why it would not be reassigned unless they did remit to us for it.

"Q But on February 20, 1961, that was the status of this Parker receivable, isn't that so?

"A That's right, that they were subject to.

"Q February 20 on you ceased any effort whatever to collect it from Dr. Parker, isn't that so?

"A We made no direct contact with Dr. Parker.

"Q How did you make any kind of contact?

"A We would go through Medical Supply, this is a common practice.

"Q They were the ones that were supposed to do the collecting?

"A The ones that were to get the doctor to renew his paying schedule.

"Q After Allied went defunct then you decided to sue Dr. Parker, is that right?

"A We had no choice.

\*　\*　\*　\*　\*　\*

"Q It would have been perfectly all right for Allied Medical Supply to receive the money from Dr. Parker, you wanted them to do it, didn't you?

"A That's correct, if they received it."

It will be noted that Allied had authority to collect under the original conditional sales agreements between Parker and Allied which were assigned to Land-Air, as was found by the lower court. It will also be noted that he was directed to collect the account or settle it. Parker was evidently involved in employment difficulties during the time of this transaction. At the same time Allied was a corporation, currently engaged in dealings of this magnitude, with which Land-Air was familiar and had dealt.

Under this state of the evidence, the lower court could well have found that Land-Air had abandoned any further attempts to collect from Parker and that whatever negotiations Allied chose to make with Parker would be of little concern to Land-Air, as it could not jeopardize what was already considered a lost cause. While the account had not been reassigned to Allied, it is plain from the evidence that Land-Air was looking to Allied alone for payment; it expected Allied either to get Parker to resume payment or to make some kind of settlement by which Allied could make the payments itself. This is shown by the testimony of Jackson, as set forth above. Also, it is to be noted from the testimony quoted that after Allied went defunct, Land-Air *then* decided to sue Parker. It had no other choice.

The trial court's conclusion that Allied was given authority to do those acts which it did in fact perform is quite logical in the light of Land-Air's seeming unconcern with any further efforts to enforce Parker's personal obligation. After the account had been "referred back" to Allied, Land-Air made no contact with Parker for over fourteen months, and it was not until after Allied became defunct that counsel for Land-Air even telephoned Dr. Parker.

Facts which further support the lower court's finding of a broad grant of authority by Land-Air to its agent Allied are: (1) Land-Air, by choosing Allied to act in its behalf, chose the very party with whom Parker had previously dealt, and who—during its previous dealings with Parker—had been unfettered by any bonds of agency, and in whose judgment Parker might be expected to rely; (2) Allied was not an ordinary collection agency, but instead was a dealer in this type of equipment and as such was familiar with contractual agreements ranging well beyond the scope of mere collection; (3) The only further contact with Parker was done by Allied without further supervision by Land-Air; and (4) The use of such broad terms as "settle" and "referred back" by the witness for Land-Air's description of the arrangements between Land-Air and Allied.

■ It is settled that agency may be proved to exist by a showing of facts which raise the implication of such a contract.

"\* \* \* It is susceptible of proof as is any other fact and may be established from the circumstances, such as the relation of the parties to each other and to the subject-matter, their acts and conduct. \* \* \*" Little v. Brown, supra, 40 Ariz. at 214, 11 P.2d at 613

The trial court found on the facts presented that the agency power in question did exist. As we have previously held, the fact that we, as individuals, might have taken a contrary view, does not authorize a reversal of a judgment. Standard Oil Co. of Calif. v. Shields, 58 Ariz. 239, 119 P.2d 116;

Richfield Oil Co. v. Estes, 55 Ariz. 81, 98 P.2d 851.

 The facts clearly show that Allied had authority to collect. However, the law is well settled that the power to collect does not give an agent authority to compromise or to release any part of a debt. In the instant case, the agent had not only the power to collect, but, according to the testimony, he had the power to settle. The word "settle" could be construed to have different meanings. But there can be little question but what it added something to the power to collect. The question then is whether the evidence which showed that there was an undisputed power to collect and a power to settle with the turning over of the account to Allied who was Land-Air's own licensed representative and who had made the original sale of the equipment to Parker, for collection or settlement—coupled with the testimony of the credit manager Jackson that after the first contacts with Parker, Land-Air had made no other direct contacts for some fourteen months, and that Land-Air looked only to Allied for payment, is sufficient to support a finding of the trial court that Allied was an agent with authority to compromise or novate the contract. We agree with the trial court that the evidence is sufficient. To hold otherwise is to disregard all of the testimony except that Allied had authority to collect.

The decision of the Court of Appeals is vacated; judgment of the Superior Court affirmed.

STRUCKMEYER and LOCKWOOD, JJ., concur.

BERNSTEIN, Chief Justice (dissenting).

I regret that I cannot concur with the decision of the majority, for I believe their decision in this case is wholly unsound as a matter of agency law, and sadly unwise as a matter of judicial policy.

The majority lays great emphasis on the following statement:

"Under established principles of appellate procedure, we must affirm the trial court if 'we can on any *reasonable* view of the evidence deduce therefrom facts which, on any theory of the law, would sustain the judgment.'" (Emphasis added.)

With this statement I wholeheartedly agree. However, I depart from the majority in what they conclude is a reasonable interpretation of the evidence.

The majority holds that the transaction between Allied, Parker, and Nationwide constitutes a novation thereby extinguishing Parker's obligation to Land-Air. In order for this result to attach, however, it is first necessary to show that Allied had the power to enter into a novation binding on Land-Air. The majority concludes that Allied had this power by virtue of its agency relationship with Land-Air.

An agent is one who has the power to act on behalf of another. Valley National Bank v. Milmoe, 74 Ariz. 290, 248 P.2d 740 (1952). His authority may be express or implied on the one hand, or apparent on the other. Aetna Loan Co. v. Apache Trailer Sales, 1 Ariz.App. 322, 402 P.2d 580 (1965). It is evident that the majority relies on implied authority as a basis for concluding that Allied had the power to effect a novation.[1]

Testimony of Land-Air's credit manager supports, perhaps, a conclusion that Allied was given express authority to "collect" the money owing from Parker. It must be stressed, however, that authority to "collect" neither expressly nor impliedly grants to an agent the authority to novate.

"* * * Authority to collect does not include authority to compromise, to re-

---

1. Implied agency, as the majority uses the term, has been defined in the following manner: "'* * * Implied agency is actual agency and the difference between it and express agency is mainly one of method of proof.' * * * [T]he word 'implied' simply means that we have no proof of express authorization but think the appearances warrant a finding that in some way the agent was authorized to [act] * * *'" Mechem, Law of Agency, § 56 (4th ed. 1952).

lease any part of the debt * * *" Restatement, Second Agency § 72, Comments Clause (a).

Rather, the authority of an agent for collection is limited to the acceptance of money or legal tender that is due. Haynes Petroleum v. Turlington, 261 N.C. 475, 135 S.E.2d 43 (1964).

Let us examine the evidence that the majority relies upon in reaching their conclusion that Allied had the authority to enter into a novation.

First the majority points to the fact that Allied was given the power to "settle", and that this indicates the power to effectuate a novation. I do not argue with the contention that the legal power to settle implies the power to novate, but I cannot agree that Allied was given the power to settle in any legal sense of the word. The word "settle" appears only on cross examination of Land-Air's credit manager and the context in which it is used makes clear its intended meaning.

Direct examination:

"Q Did you ever request Allied Medical to make collections for the Plaintiff from Dr. Parker on these contracts? * * *

"A * * * It's not a simple thing to answer because you do not tell somebody to go and effect a collection. You put [it] in a different way. And that's not what you say. You see, they were indebted to us by recourse through the contract. We could have charged their account and it was in this way that I explained to them that unless we received payment from Dr. Parker it would be necessary to charge this account or take whatever legal action would be necessary to protect our interests.

* * * * * *

Cross examination:

"Q Now, as the credit manager I suppose your chief function is to see, or one of your chief functions, I should say, is to see that receivables are paid, is it not?

"A That's correct.

"Q And in doing this is not customary to periodically review accounts and especially those accounts on which payments have not been made?

"A It is.

"Q And is it not also customary when payments have not been made to make follow up contacts with the debtors?

"A There is a differentiation between a follow up of an accounts receivable and a follow up of an assigned contract. After a certain period of time on an assigned contract where a letter or two has not brought any results it is then referred back to the dealer.

"Q And you expect the dealer to make the collection for you?

"A Not for me, he either collects it or settles the account in order to avoid his having to repurchase the equipment or contract.

"Q He collects the account or settles it so that he's not going to have to rebuy it back from you?

"A That's right.

"Q But he did these things while you were the owner of the account? Let me be specific; in this case you did not reassign this contract to Allied Medical, did you?

"A No, it's not the practice as a rule to immediately reassign it, then you'd be going back and forth.

"Q You went back to the dealer who was Allied Medical and told them that (sic) either collect the account or settle the account or you were going to go back on them on this recourse, is that right?

"A That's correct.

* * * * * *

Re-direct examination:

"Q Is there any record kept by which you told Allied to settle the account?

"A I don't recall that the word 'settle' was used because 'settle' usually means to lower or come to some kind of agreement at a lower figure. This I can't recall. I do recall they were asked to contact the doctor and get him back on his paying schedule to get him to pay something on his account." (Emphasis added.)

It is evident from this testimony that the word "settle" was not used in its legal sense. It was not meant either as a power to compromise or to adjust a dispute. See Goldbard v. Empire State Mut. Life Ins. Co., 5 A.D.2d 230, 171 N.Y.S.2d 194 (1958); Toombs v. Stockwell, 131 Mich. 633, 92 N.W. 288 (1902). Obviously this testimony indicates that Allied had been told that they had best get the delinquent payments straightened out or else Land-Air would be impelled to exercise its right of recourse. It appeared at only one point on cross examination and was used at no other time.

But more important, it is the height of folly to believe that Land-Air would give Allied the authority to compromise the Parker account when Land-Air had a perfectly good right of recourse against Allied. Under these circumstances, it cannot be *reasonably* concluded that there was proof that Land-Air gave Allied a power to settle in the legal sense, and as a consequence, this testimony cannot properly be the basis for a finding that Allied was given a novation authority.

The majority of this court also relies heavily on the fact that Land-Air made no contact with Parker for more than fourteen months after the account had been "referred back" to Allied, and that this represents a decision on the part of Land-Air to look only to Allied for payment on the Parker account. Furthermore, the court presumes that Land-Air, by this action, abandoned any further attempts to collect from Parker, and consequently had no interest in whatever negotiations Allied made with him.

These conclusions, in my opinion, are totally unwarranted by the evidence. Land-Air never swayed from their attempts to get Parker to make payment on his conditional sales contract obligation. Indeed, they had corresponded with Parker on numerous occasions demanding that he resume payments. It was only after it became clear to Land-Air that they were getting nowhere with Parker that they contacted Allied and informed them that they had better collect the amount due from Parker or face the responsibility of being liable themselves on their recourse obligation. It is obvious that the reason Land-Air did not contact Parker during the fourteen months in question was because they had failed to obtain any results from their previous contact with him. But to say that this indicates "seeming unconcern" is absurd. Land-Air had no intention of releasing Parker from his obligation. Clearly this was not yet a "lost cause", as the majority describes it, for Land-Air still had a right of recourse against Allied. It can hardly be presumed to be reasonable business practice to grant authority to one's agent to compromise a debt for less than what is due when the agent himself is liable for the entire debt.

In addition, the majority lists a number of other factors which, they conclude, could have been used by the trial court to support its finding a novation.

The majority indicates that since Parker had previous dealings with Allied when it was not yet the agent of Land-Air, that this would have been a good reason for Parker to rely on Allied's subsequent representations. But of course Parker had dealt with Allied when it was not the agent of Land-Air, for Allied had been the original seller of the x-ray equipment. Moreover, Parker had knowledge that the original conditional sales contract had been assigned to Land-Air. He was not blind, as the majority would have us believe. Indeed, how could he rely on Allied's representations when Land-Air had consistently

attempted to make him pay his debt? As we said in Brutinel v. Nygren, 17 Ariz. 491, 500, 154 P. 1042, 1045–1046, L.R.A. 1918F, 713 (1916):

"The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and like a railroad crossing suggests the duty to 'stop, look, and listen,' and if he would bind the principal *is bound to ascertain, not only the fact of agency, but the nature and extent of the authority,* and in case either is controverted the burden of proof is upon him to establish it. In fine, he must exercise due care and caution in the premises." (Emphasis added.)

The majority also emphasizes that Allied was not an ordinary collection agency, but was a dealer in x-ray equipment. Consequently, Allied had familiarity with various types of agreements other than mere collection contracts. I simply fail to see what relevance this factor has in determining the existence of implied agency. This factor cannot be a basis for concluding that implied authority exists. For one of the most basic precepts of agency law is that an agent cannot create power in himself to bind his principal.

" 'The agent's authority, moreover, may not be shown merely by proving that he acted as agent. A person can no more make himself agent by his own acts * * * than he can by his own declarations or statements.' " Litchfield v. Green, 43 Ariz. 509, 511, 33 P.2d 290, 291 (1934).

On the other hand, if the majority is utilizing this factor to conclude that Parker could reasonably rely on Allied's representations because of its status as a dealer, the rationale is equally unsound. First, as noted above, Parker had notice of the assignment. Second, and more important, the burden is on the person dealing with an agent to ascertain the nature and extent of his authority.

Finally, the majority restates its argument that Land-Air failed to supervise Allied in its dealings with Parker. I have already stated that the reason Land-Air did not contact Parker was because its prior communications with him had been fruitless. Indeed, the majority imposes a duty on the principal to investigate everything its agent does. Unfortunately, this would create chaos in the business world. Agency is useless if the principal must guard himself at every moment against the misdeeds of his agent.

I am convinced that the evidence cannot reasonably support the trial court's finding that Allied had authority to enter into a novation.

I would vacate the Court of Appeals decision, 4 Ariz.App. 395, 420 P.2d 967 (1966) and reverse the judgment of the trial court.

UDALL, Justice (dissenting):

The majority of the Court has concluded that Land-Air should be bound by the contract which Allied Medical purportedly negotiated in behalf of Land-Air. With this result I cannot concur; thus with regret I have elected to dissent from that determination.

In this matter Parker maintains that Allied Medical was acting as an agent for Land-Air and that through the exercise of this incident authority Allied had effected a novation which released him from the obligation to pay Land-Air under the original conditional sales contracts. In order for this result to have attached, however, it is first necessary that Allied Medical have had the authority to enter into a novation binding on the plaintiff.

First I will turn to the possible sources of authority necessary to validate the act of an agent. Authority may be of an actual or real nature as when it is manifested by oral or written statements (express) or by conduct (implied). Restatement, Second, Agency § 7. Also, apparent authority may empower an agent to affect the legal relations of a principal with respect to a third

person by acts done in accordance with such principal's manifestations of consent to such third person that such agent shall act as his agent. Restatement, Second, Agency § 8. Finally the liability of a principal to a third person may be based upon the fact that the agent had a power arising from the agency relationship—that policy requires that the agent should have the power to bind the principal. Restatement, Second, Agency § 140.

In addition the principal becomes responsible for contracts made for him by one purporting to act on his account as if the transaction had been authorized if with knowledge of the material facts the principal ratifies such action. Restatement, Second, Agency § 143. Also, though an agent or apparent agent does not have power to bind his principal in a particular transaction, the transaction may nevertheless subject the principal to liability or to the loss of his interests where the principal misleads or fails to undeceive a third person; the principal benefits from the transaction; or the subject matter is a negotiable instrument which has been negotiated. Restatement, Second, Agency § 141.

The defense contends that in submitting this collection problem to Allied Medical, Land-Air expressly authorized Allied Medical to "settle". Thusly it is argued that Allied Medical was empowered to cancel the original contracts by a sale and lease-back agreement between Parker and Nationwide Leasing. Further we are directed to the testimony of an officer of Land-Air wherein the term "settle" was used and this it is alleged determines that Allied Medical was a fully authorized agent empowered to effect a novation. I do not agree with the defense contention. Even the testimony to which the Court is referred does not bear out the defendant's contention that express authority was involved here. I feel the record shows that no actual authority of an express nature can be found to have existed in this case. For it is evident from the testimony that the word "settle" was not used in its legal sense. The use of this word by the credit manager was not intended as a power to compromise a debt or novate a contract.

The intent of the instruction given by Land-Air's credit manager was that Allied Medical was thereby informed that if the delinquent payments were not straightened out Land-Air would exercise its right of recourse against Allied Medical. Under these circumstances, it cannot be reasonably concluded that there was sufficient proof that the plaintiff gave Allied Medical a power to settle in the legal sense argued by the defendant, and as a consequence, this testimony cannot properly serve as a basis for finding that Allied Medical was given novation authority. Thus I am compelled to conclude that there was no express authority to validate the action of Allied Medical in purporting to represent Land-Air.

Further there was no evidence offered which allows actual authority to arise by implication. To the contrary the evidence did not show any prior dealings of this nature whereby Allied Medical or any other party had been given authority to novate a contract. In addition Land-Air was unaware of these negotiations and hence could not have consented by its inaction in failing to warn Parker of Allied Medical's limited authority. Finally there was nothing about the relationship of Allied Medical or Mr. Hare to Land-Air which justifies the inference of authority. In fact, as was obvious to Parker who had acknowledged notice of the assignment of the conditional sales contracts to Land-Air with the reservation of recourse against Allied Medical, the position of Allied Medical was that of a party attempting to itself avoid liability to Land-Air. Thus while I am mindful of the rule that actual authority may arise and be proven by implication, I do not feel that proof of such authority was given in this case. Canyon State Canners v. Hooks, 74 Ariz. 70, 243 P.2d 1023; Arizona Storage & Distributing Co. v. Rynning, 37 Ariz. 232, 293 P.

16; 3 Am.Jur.2d, Agency, § 73, p. 475; 2 C.J.S. Agency § 99, p. 1227.

There is of course inherent agency authority which arises from the relationship because policy considerations require that an agent under such circumstances should have the power to bind the principal. Restatement, Agency, § 140. However this policy should only be invoked when to not recognize authority in such a case would be to mislead third persons. Further this Court has recognized that a third person knowingly dealing with an agent has a duty to ascertain the source and scope of that agency authority and that should either such issue be controverted the burden of establishing same will fall on the third person. Bank of America v. Barnett, 87 Ariz. 96, 348 P.2d 296; Lois Grunow Memorial Clinic v. Davis, 49 Ariz. 277, 66 P.2d 238; Brutinel v. Nygren, 17 Ariz. 491, 154 P. 1042, L.R.A.1918F, 713. Therefore in order to find that the term "settle" and the conduct involved here justify a determination that Allied Medical had inherent authority we must find that Parker acted as a reasonable and prudent man aware that he is dealing with an agent, Lois Grunow Memorial Clinic v. Davis, supra. Here Parker dealt with a new person—with whom he had never dealt, said person purporting to represent a third party—with which party Parker had never dealt. Yet Parker without ascertaining the validity of the alleged agent's authority or the scope thereof negotiated a contract with such agent which purported to relieve Parker of all but a responsibility to rent the involved equipment while reducing the amount due Land-Air by some seventy percent. From the facts in this case I conclude that Parker did not meet the requisite standard of conduct and that he was imprudent in failing to ascertain the scope of Allied Medical's authority and that therefore Parker acted at his own peril in dealing with Allied Medical's Mr. Hare.

As to the issues of apparent authority, ratification and liability based on estoppel I will merely state that there was no evidence to support a finding against Land-Air on any of these bases and since the majority has chosen not to discuss them I also limit my attention to the remaining issues.

Having considered the issue of authority to novate as an independent power and concluding that such power was not authorized expressly, impliedly, apparently, inherently nor by ratification or estoppel I next turn to the question of the scope of the authority granted.

The testimony of plaintiff's credit manager supports a conclusion that Allied Medical was given express authority to "collect" the money owing from the defendant. Authority to "collect", however, does not expressly or impliedly give an agent authority to novate. Restatement, Second, Agency § 72. Rather, the authority of an agent for collection is limited to the acceptance of money or legal tender that is due.

An agent's powers are to be strictly construed, to allow the authorized exercise of only such powers as are expressly given or are reasonably required to perform those given. Thus a third party who deals with an agent and knows of the agency is under a duty to ascertain the scope of the agency. Hence if the agent acts beyond his actual authority the third party cannot look to the principal absent a showing that the principal's conduct was such as to mislead the third party or to confer apparent authority. Having previously dismissed the issues of apparent authority or estoppel as inapplicable I would hold that Parker acted at his own risk in dealing with an agent who exceeded his authority and thus must personally bear the loss incurred.

The majority states and I agree that, "agency may be proved to exist by a showing of facts which raise the implication of such a contract." That agency may be so proven is basic evidence law. But the recitation of such rule does not ipso facto make that rule determinative of the issue at hand. To the contrary because of the adverse position to Land-Air which Allied occupied, it seems an unwarranted conclusion to find

that authority to novate could arise by implication.

The opinion of the majority cites facts allegedly supporting the trial court's determination. Thus the majority states that Land-Air by choosing Allied "to act in its behalf, chose the very party with whom Parker had previously dealt, and who—during its previous dealings with Parker—had been unfettered by any bonds of agency, and in whose judgment Parker might be expected to rely." To this I must reply that Mr. Hare had only recently succeeded to his position with Allied; that prior to the time of the alleged novation he had had no dealings with Parker; that obviously Allied had been unfettered by bonds of agency in its initial dealings, for at such time Allied was contracting only for itself; and finally, that a person knowingly dealing with an agent, as Parker was, has the duty of ascertaining the scope of that agent's authority. The majority further states that Allied was not an ordinary collection agency but as a dealer was familiar with agreements ranging beyond mere collection. However, I cannot see that an agent's knowledge of types of contractual agreements in any way justifies an inference that thereby the principal intended that the agent should have authority to enter into such agreements. The majority conclusion is based on the testimony of Land-Air's credit manager in employing the word "settle" in describing his instructions to Allied Medical. I feel that the result of the majority opinion compels the application of a lawyer's definition for a commonly-used word in the face of an obviously contrary intent.

I am compelled to take note that much weight seems to be given by the majority to the fact that after its unsuccessful collection attempts by letter, Land-Air referred his matter to Allied and made no further contact with Parker for a period of fourteen months. That no contact with Parker was made by Land-Air for this period does not to me seem determinative of any involved issue. It should be considered that Land-Air is an out-of-state corporation, that it needed time to contact Allied, that Allied had to contact Parker, that during this period Allied began to have internal problems that resulted in its dissolution and that it was necessary for Land-Air to wait out Allied's internal upheaval in order to ascertain its own status with Parker. This delay is apparently what is employed to justify the majority in concluding that,

"* * * the lower court could well have found that Land-Air had abandoned any further attempts to collect from Parker and that whatever negotiations Allied chose to make with Parker would be of little concern to Land-Air, as it could not jeopardize what was already considered a lost cause."

But this interpretation of the case seems altogether unjustified. For Parker's debt was far from being a lost cause. Land-Air could have immediately sued Parker, which action it later resorted to or it could have reassigned the involved contracts to Allied Medical and received the amounts thus due from Allied Medical. Thus too it seems an extreme position to find that Land-Air would have empowered Allied Medical to receive in its behalf less than a third of what was due by renegotiating, when it would have been a simple matter for Land-Air to have avoided the difficulty with Parker by the use of its recourse against Allied.

A final issue with which I choose to deal is the assertion by Parker that the Court of Appeals in determining this matter disregarded a prior decision of this Court which was directly in point and directly contrary to the Court's opinion on which this petition for review is considered. Parker cites as authority for his position the case of Little v. Brown, 40 Ariz. 206, 11 P.2d 610, which was relied on and cited in the majority opinion. With the defense contention that this case substantiates its position I beg to differ. In that case the assignor made an assignment, for collec-

tion purposes, to his son. Subsequent to that assignment the assignor, as the real party in interest compromised the dispute and received compensation therefor. Further the aspect of knowledge, discussion and close ties between the assignor and assignee were such as to justify the Court in finding that the assignee had tacitly consented to the assignor's compromise.

In the instant case the parties are, in effect, reversed from the positions of the parties in the Little v. Brown case, for here the assignee is the real party in interest.

Here the assignor acted without the knowledge of, or authority from, the assignee. Further, no facts were herein presented from which Land-Air can be implied to have consented to a novation. The circumstance of knowledge, discussion of settlement and inaction are not present here to bind Land-Air the real and acknowledged owner of the claim.

For these reasons I would affirm the judgment of the Court of Appeals which reversed the trial court judgment for the defense.