472 P.2d 24

**The VALLEY NATIONAL BANK of Arizona, a national banking association, Appellant,**

v.

**Robert G. MOOREMAN, Receiver for American Title & Trust Company, an Arizona corporation, the Lomas & Nettleton Company, a Connecticut corporation, and Earl C. Moore and Audrey Moore, his wife, Appellees.**

**No. 9844.**

Supreme Court of Arizona, In Division.

July 2, 1970.

Rehearing Denied Sept. 15, 1970.

Rawlins, Ellis, Burrus & Kiewit, by Chester J. Peterson, Phoenix, for appellant.

Fennemore, Craig, von Ammon & Udall, by Richard A. Miller, and Michael Preston Green, Phoenix, for appellee, The Lomas & Nettleton Co.

Roush, Mori & Feinstein, by David M. Lurie, Phoenix, for appellees, Earl C. Moore and Audrey Moore.

Kramer, Roche, Burch, Streich & Cracchiolo, by Paul D. Levie, Phoenix, for appellee, Robert G. Mooreman.

LOCKWOOD, Chief Justice.

American Title and Trust Company had two checking accounts. One, in the Guaranty Bank, was designated its escrow account; the other, in the Valley National Bank, was called its trust account, and was used to deposit and disburse funds held in trust for various parties. The Valley Bank was fully aware of the nature of the trust account.

The Lomas and Nettleton Company, hereinafter called Lomas, also maintained a checking account in the Valley Bank. On August 18, 1966 it deposited in that account, two checks totaling nearly $23,000. The checks were drawn by American Title on its escrow account in the Guaranty Bank. The Valley Bank credited Lomas' account, and forwarded the checks to the Guaranty Bank for payment. The latter bank promptly returned them because of insufficient funds.

It is conceded by Lomas that its deposit was made by a deposit slip which referred to a bank rule that:

"This bank acts only as depositor's collecting agent * * *. All items are credited subject to final payment and to receipt of proceeds of final payment in cash or in solvent credits by this bank."

In State v. DeVinney, 98 Ariz. 273, 403 P.2d 921 we held that:

"The general rule is that a bank has a right to charge a dishonored check or draft back against the depositor, both where the bank becomes the owner and where the deposit is made for collection only. The right to charge back may be expressly preserved by the terms of the deposit slip, or, in the absence of a literal agreement, the law may imply the right of the bank to charge back."

In other words the Valley Bank's credit to Lomas was provisional. If the checks were paid on presentment, the credit would become absolute; if they were dishonored,

the amount involved could be charged back to Lomas' account.

On August 23, 1966 the Valley Bank received notice of dishonor of the checks deposited by Lomas. Instead of charging the amount of the checks back to Lomas and notifying it of that action, the bank promptly charged the checks to American Title's aforementioned trust account and said nothing to Lomas about its action.

Over one month after the original deposit, the bank wrote Lomas advising it of the dishonor of the checks, and stating that:

"Instead of charging the checks back to your account, we set off these checks against the American Title and Trust Company 'Trust Account' in this office * * *. To date no official demand has been made on us to reimburse the trust account. However, we felt that since the contingency exists, you should be notified so that if necessary, you might take steps to protect yourself under the Indemnity Agreement of American Title and Trust Company, Miami, Florida."

Shortly thereafter, a receiver was appointed for American Title. He initiated this action to require the Valley Bank to replace the sums taken from American Title's trust account. The bank secured an order permitting it to bring Lomas into the lawsuit as a defendant, and filed a cross-complaint against Lomas, asking that the court—if it required the money to be replaced in the trust account—enter an order permitting the bank to charge the dishonored checks back to Lomas.

On motion for summary judgment the trial court held against the bank on all issues. The judgment required the bank to replace the funds in the trust account, and denied the bank the right to charge the checks back to Lomas. The bank appealed.

The sole issue on appeal is whether the bank, by its conduct, lost the right of charge back. It concedes the correctness of that part of the judgment which required it to reimburse the trust account. Lomas concedes that had the bank prompt-

ly notified it of the dishonor of the checks, the bank could have charged them back to its account.

The Uniform Negotiable Instruments Law was adopted in Arizona in 1901. It appears in A.R.S. §§ 44–401 to 44–595. These sections were in effect when the transactions arose in this case. The following provisions were pertinent:

> "Every endorser who endorses without qualification, warrants to all subsequent holders in due course: * * * that if it [the instrument] be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder * * *." § 44–466.

> "* * * When the instrument is dishonored by nonpayment, an immediate right of recourse to all parties secondarily liable thereon accrues to the holder." § 44–484.

> "* * * When a negotiable instrument has been dishonored * * * by nonpayment, notice of dishonor must be given * * * to each endorser, and any * * * endorser to whom such notice is not given is discharged." § 44–489. "Where the person giving and the person to receive notice reside in the same place, notice must be given * * * before the close of business hours on the day following." § 44–503.

For brevity, the content of these four sections may be summed up by the following statement: An endorser, who resides in the same place as a holder, is obligated to make good a dishonored check in the hands of a holder in due course if that holder gives him notice within one day of learning of the dishonor; failure to give notice within one day discharges the endorser's obligation.

The N.I.L. was a codification of the law merchant which had developed over many centuries, from experience that indicated that such rules were necessary to insure stability in trade and commerce. Merchants needed, and still need, to know the amounts of money in their accounts, and they need to have that information promptly. They know that there is an interval of uncertainty between the deposit of a check and its clearance, and they know that the length of that interval varies with the distance between their banks and the bank on which a deposited check is drawn. When the banks are in the same city, that interval is short, and after it has elapsed the depositor may rest easy in the knowledge that the deposited items have been paid by the drawee bank. Without this certainty, billions of dollars of commercial transactions would be jeopardized.

The question of whether a bank becomes a holder in due course of checks deposited under an agreement that the credit is subject to "final payment in cash or solvent credits" has been extensively litigated. Cases on the subject have been gathered in a series of annotations commencing with 6 A.L.R. 252 and ending with 59 A.L.R.2d 1173. Some of the cases hold that the bank is a holder in due course if it permits the depositor to draw on the provisional credit and the entire amount is withdrawn —e. g. Lowrance Motor Company v. First National Bank of Auburn, 238 F.2d 625, (5th Cir. 1956); some hold that the bank is a holder in due course only for the amount actually withdrawn by the depositor—e. g. Southern Trust Co. v. Vaughn, 277 F. 145 (8th Cir. 1921). In the instant case, the Valley Bank pleaded that Lomas "has been credited with the amount of said checks and has had the use and benefits thereof." It would seem to be a fair inference from that allegation that Lomas drew the money out and used it. Business firms do not ordinarily leave $23,000 in a non-interest-bearing checking account. Furthermore, in count four of its cross-complaint, the bank pleaded that it became a holder in due course.

In Lowrance Motor Company v. First National Bank of Auburn, supra, the court had before it a case where the provisional credit was withdrawn. The checks had been credited "subject to final payment in cash or solvent credit." The court in hold-

ing the bank to be a holder in due course, said:

> "But the main question here presented can be disposed of by application of settled principles of law * * * it appearing without dispute that the Bank did pay value for the checks by giving immediate unrestricted credit and by permitting the credit to be withdrawn, *the relationship between the parties was fixed by these undisputed facts rather than by what was written in the endorsement or on the deposit slip.*" (Emphasis added.)

That case differed from the instant case in that it had no written agreement such as existed here. However, in 1925, in the case of City of Douglas v. Federal Reserve Bank of Dallas, 271 U.S. 489, 46 S.Ct. 554, 70 L.Ed. 1051, the following appeared on the face of the depositor's passbook: "All out of town items credited subject to final payment." The Court cited Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 and applied its rule, saying:

> "When paper is endorsed without restriction by a depositor, and is at once passed to his credit by the bank to which he delivers it, he becomes the creditor of the bank; *the bank becomes the owner of the paper, and in making the collection is not the agent for the depositor.*" (Emphasis added.)

The Court then said that the custom of the bank in charging the check back to the depositor's account when it was unpaid, "* * * was simply a method pursued by the bank of exacting payment from the indorser of the check, *and nothing more.*" (Emphasis added.) The Court also stated that:

> "* * * The weight of authority supports the view that upon the deposit of paper unrestrictedly endorsed, and credit of the amount to the depositor's account, the bank becomes the owner of the paper, *notwithstanding a custom or agreement* to charge the paper back to the depositor in the event of dishonor." (Emphasis added.)

It is therefore clear that in the instant case, the Valley Bank, regardless of the agreement on Lomas' deposit slip, became a holder in due course, and it was bound to notify Lomas not later than the day after it was advised of the dishonor of the checks deposited. Failure to do so, discharged Lomas' liability on its endorsement, which is the only basis on which the right to charge back rests. This, of course, means that the right to charge back was lost on August 23, 1966—even before the bank wrongfully undertook to take the money from the trust account.

However, even if this were not so, the bank's act in taking the money from the trust account would lead to the same result, for by that action, the bank accepted as payment, the charge against the trust funds. Assuming, arguendo, that the bank was only Lomas' agent for collection, it had no right to take anything but cash in payment for the check. Land-Air v. Parker, 103 Ariz. 1, 435 P.2d 838. By taking the money in the trust account, it elected to accept the risk of the impropriety of that act, transformed its relationship with Lomas from principal and agent, to creditor and debtor, and made the provisional credit absolute.

A similar situation arose in Cohen v. First National Bank of Nogales, 22 Ariz. 394, 198 P. 122. There, the deposited checks were drawn on the depositor's bank which chose to credit his account without looking at the drawer's account to see whether it contained sufficient funds to pay the checks. After crediting the depositor's account it found that its credit was improvident, and attempted to charge the checks back to the depositor. We said in our opinion in that case:

> "Under the completed transaction the relation between the parties was that of banker and depositor and the bank became the debtor to the plaintiff for the amount of the general deposit placed to his credit * * *. After the discovery that the funds in the Gaxiola account were insufficient to take care of the

check, the bank attempted to retrace its steps. This it could not do. It was too late * * *. Consequently * * * *charging back the amount of the check to the plaintiff's account, were immaterial acts, and of no effect* * * *. It may be, if the condition of the Gaxiola account had been examined before the letter was mailed, credit would not have been given, but *the bank did not see fit to make the examination. It waived all inquiry and sent the letter.* Manifestly the present dilemma of the bank is due wholly to its own laches." (Emphasis supplied.)

There is no difference between a bank which pays a depositor the proceeds of a check drawn on an account containing insufficient funds (a fact easily ascertainable by merely examining the account) and a bank which pays a check out of the wrong account.

For all of the above reasons, we affirm the judgment of the trial court.

STRUCKMEYER, V. C. J., and Mc-FARLAND, J., concur.