613 P.2d 293

**NOGALES SERVICE CENTER, Plaintiff/Appellant,**

v.

**ATLANTIC RICHFIELD COMPANY, Defendant/Appellee.**

No. 2 CA–CIV 3331.

Court of Appeals of Arizona, Division 2.

April 14, 1980.

Rehearing Denied May 21, 1980.

Review Denied June 17, 1980.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P. C. by Michael J. Meehan, Tucson, for plaintiff/appellant.

Lesher, Kimble & Rucker, P. C., and Thomas L. Hall, Tucson, for defendant/appellee.

## OPINION

HOWARD, Judge.

The trial below was on Nogales Service Center's (NSC) claim for breach of contract against Atlantic Richfield Company (ARCO). This is an appeal from the judgment entered on a jury verdict in favor of ARCO. NSC contends the trial court erred in denying certain instructions and in the admission and rejection of evidence.

Prior to June 1969, Albert F. Cafone and Angus McKenzie were produce brokers in Nogales, Arizona. They decided that profits could be derived from the operation at Nogales of a facility to sell fuel to the great number of trucks which seasonally came to Nogales, loaded with produce to be transported to points in the United States and Canada. No such enterprise was operating in Nogales at that time.

Before contacting ARCO, Cafone and McKenzie approached Texaco and Shell. They were looking for a supplier to lend them a large sum of money to be applied towards the construction and equipment of a suitable facility. They finally contacted ARCO which was itself looking for a truck stop in the area. Cafone and McKenzie organized a corporation, Nogales Service Center, and entered into an agreement with ARCO for construction of the facility. The total estimated cost of the facility which was to include an auto/truck service sta-

tion, coffee shop, motel and brokerage offices, was $508,000. ARCO lent the corporation $300,000 to help finance construction.

Construction of the truck stop began in 1969 and was finished in early 1970. Operations began in April or May of 1970. As originally built, the facility did not include the motel and restaurant, a factor which created a definite problem. The funds which ARCO lent to NSC were not put in escrow and some were spent for a cantaloupe crop which failed, therefore the restaurant was not constructed.

NSC and ARCO also entered into a products agreement on November 4, 1969. It was to be effective for a period of 15 years, subject to termination by mutual agreement after the 10th year, and provided for the sale of fuel at prices to be fixed by ARCO, subject to change by the latter at any time without notice. It called for the purchase of at least 50% of NSC's fuel from ARCO.

NSC's operation was in financial difficulty from the beginning of its operation. Among other things, its price for diesel fuel was not competitive with truck stops in the Tucson area. In May of 1972, Cafone's brother-in-law, William Terpenning, bought out McKenzie and assumed his liability on the $300,000. In July and August, Cafone and Terpenning met in Los Angeles, California with Joe Tucker who was then ARCO's manager of truck stop marketing. The problem of competitive pricing was discussed. It was at these meetings that, according to Terpenning, NSC and ARCO entered into an oral agreement which formed the basis of NSC's claim. Terpenning testified that Tucker told him that the construction of a motel and restaurant at the truck stop was a "must", that if NSC constructed these facilities, which were estimated to cost $400,000, it would lend $100,000; that ARCO would give NSC a 1¢ per gallon across the board discount on all diesel fuel and that it would keep NSC "competitive". In reliance on Tucker's promise, Terpenning bought out Cafone, borrowed money and used his own funds to construct the motel and restaurant. ARCO approved the loan

application after the construction was commenced and lent the $100,000 but the 1¢ per gallon discount was disapproved. According to Terpenning, ARCO never made NSC "competitive".

Terpenning and NSC defaulted on the original note and on the $100,000 note. ARCO then brought a foreclosure action and prevailed. This suit involves a counterclaim filed by NSC which was tried after the foreclosure judgment. For convenience in the trial court, NSC, the counterclaimant, was designated the plaintiff and the original plaintiff, ARCO, was designated the defendant.

At trial ARCO contended that Tucker never agreed to make NSC competitive or to give it an across-the-board 1¢ discount; that if such an agreement were made by Tucker it was outside his authority and that the statute of frauds barred any action on the alleged oral contract.

The trial court, without objection, gave the following instructions relating to the authority of an agent:

"An employee-agent has apparent authority to make an agreement binding on his employer-principal, if, but only if, the latter through officers or other agents authorized to do so has held out that employee-agent through the party dealing with him, has such authority. In this case, in order to find Joe Tucker had apparent authority to make an agreement for ARCO, you must find that ARCO had actually or by necessary implication, represented to the officers of Nogales Service Center that Tucker had such authority; and you must find further that such representations were made by officers or other agents of ARCO having authority from the company to make them.

If you find by a preponderance of all the evidence that such an agreement was made, then you shall consider whether those making it were authorized by their respective companies to do so. An employee-agent can legally bind his employer-principal only when he has actual or apparent authority to do so. Authority

of either type, actual or apparent, can be derived only from acts of the employer-principal. An employee-agent cannot confer authority upon himself merely by claiming it for himself. If you find that Joe Tucker had no actual authority to enter into any agreement for ARCO, then he could do so in such a way as to bind ARCO if, but only if, you find that he had apparent authority to make an agreement."

The trial court refused to give the following instruction offered by the appellant:

"Requested Jury Instruction No. 21.

ARCO's employees who dealt with Service Center in the claimed oral agreements made ARCO responsible for any such agreements if they are acts which usually accompany or are incidental to transactions which the agent is authorized to conduct, even if the employees were forbidden to make such agreements, if persons from Nogales Service Center reasonably believed that ARCO's employees were authorized to make them, and has no notice that ARCO's employees were not so authorized."

The trial court also refused appellant's Instruction No. 23, but since we find the essence of that instruction to be covered by Instruction No. 21, we discuss only No. 21.

Appellee contends that No. 21 was covered by the instructions which were given. We do not agree. The instructions given covered only actual or apparent authority. Inherent authority depends upon neither of these concepts since it may make the principal liable because of conduct which he did not desire or direct, to persons who may or may not have known of his existence or who did not rely upon anything which the principal said or did. See, Seavey, Handbook of the Law of Agency, Secs. 58 and 59, at 105–09 (1964).

The Restatement (Second) of Agency Sec. 8A (1957) defines inherent agency power:

"Inherent agency power is a term used in the restatement of this subject to indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent."

The rationale of inherent agency power is explained in Comment *b* to Sec. 8A:

"The other type of inherent power subjects the principal to contractual liability or to the loss of his property when an agent has acted improperly in entering into contracts or making conveyances. Here the power is based neither upon the consent of the principal nor upon his manifestations. There are three types of situations in which this type of power exists. First is that in which a general agent does something similar to what he is authorized to do, but in violation of orders. In this case the principal may become liable as a party to the transaction, even though he is undisclosed. As to such cases, see Sections 161 and 194. Second is the situation in which an agent acts purely for his own purposes in entering into a transaction which would be authorized if he were actuated by a proper motive. See §§ 165 and 262. The third type is that in which an agent is authorized to dispose of goods and departs from the authorized method of disposal. See §§ 175 and 201.

In many of the cases involving these situations the courts have rested liability upon the ground of 'apparent authority', a phrase which has been used by the courts loosely. If the meaning of the term is restricted, as is done in Section 8, to those situations in which the principal has manifested the existence of authority to third persons, the term does not apply to the above situations. No theory of torts, contract or estoppel is sufficient to allow recovery in the cases. But because agents are fiduciaries acting generally in the principal's interests, and are trusted and controlled by him, it is fairer that the risk of loss caused by disobedience of agents should fall upon the principal rather than upon third persons."

Appellant's offered Instruction No. 21 is a paraphrase of Sec. 161 of the Restatement (Second) of Agency which states:

"A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized."

As explained in Comment *b* to Sec. 161, inherent power is to be distinguished from apparent authority:

"The Rule stated in this Section applies to cases in which there is apparent authority, but includes also cases in which there is no apparent authority. Thus, the principal may be liable upon a contract made by a general agent of a kind usually made by such agents, although he had been forbidden to make it and although there had been no manifestation of authority to the person dealing with the agent."

The rule set forth in Sec. 161 was apparently followed by the court in *Lois Grunow Memorial Clinic v. Davis*, 49 Ariz. 277, 66 P.2d 238 (1937) although the court at times used the term "implied authority" for inherent authority and confused "apparent authority" with inherent authority.

Sec. 161 uses the term "general agent". The Restatement (Second) of Agency defines a "general agent" as an agent authorized to conduct a series of transactions involving a continuity of service. Restatement (Second) of Agency Sec. 3 (1957). Tucker dealt with the various truck stops accounts in the area of special problems, on matters of investment and discounts. Although the evidence was that he did not have authority to grant the alleged across-the-board discount, he did have authority to grant certain discounts such as volume discounts, gasoline merchandising discounts and dealer temporary aid discounts. On the subject of an agent disobeying the principal it was observed by Judge Learned Hand in the case of *Kidd v. Thomas A. Edison, Inc.*, 239 F. 405 (S.D.N.Y.1917), aff'd, 242 F. 923 (2nd Cir. 1917) that:

"It makes no difference that the agent may be disregarding his principal's directions, secret or otherwise, so long as he continues in that larger field measured by the general scope of the business intrusted to his care." 239 F. at 407.

However, there are two reasons why there was no error in refusing Instructions 21 and 23. First, these instructions conflict with and contradict the instruction given, without objection, which told the jury the agreement was binding only if there was actual or apparent authority. The second reason is the form of objection made to the refusal. It was:

"Plaintiff Nogales Service Center objects to refusal of Instructions 21 and 23 on the grounds that the evidence would support a finding that the agreement sued upon was made within the incidental or ostensible authority of the employees of ARCO who dealt with Service Center. The Instructions are correct statements of the law and are supported by the evidence."

The first sentence adds nothing to the last sentence. It is a general objection and does not comport with Rule 51(a), Arizona Rules of Civil Procedure, 16 A.R.S. See *Sult v. Bolenbach*, 84 Ariz. 351, 327 P.2d 1023 (1958).

Appellant contends the trial court erred in admitting appellee's Exhibit T. We do not agree. This exhibit showed, inter alia, what it cost ARCO for the diesel fuel it delivered to NSC and what ARCO was paying for it. Since NSC claimed that ARCO was overcharging it for diesel fuel and was not making it competitive, Exhibit T, which showed ARCO was losing money on its sales to NSC, was relevant.

Appellant offered an exhibit which showed three different methods of calculating damages for breach of contract. Method III was excluded by the court. Since the jury did not find any liability there was no prejudicial error. *Snethen v. Gomez*, 6 Ariz.App. 366, 432 P.2d 914 (1967).

■ NSC also contends the trial court erred when it refused the following instruction:

"If you find there was the slightest possibility that ARCO's agreements could have been performed within one year, the oral agreements between ARCO and Service Center are enforceable."

A.R.S. Sec. 44–101(5) prohibits the bringing of an action based upon an agreement which is not to be performed within one year from the making thereof. Terpenning testified that ARCO's agreement to make NSC "competitive" and give a 1¢ across-the-board discount on diesel fuel was to last as long as the products agreement. Since the products agreement was not even terminable by mutual agreement until 10 years after November of 1969, it is evident that the alleged oral agreement was not to be performed within one year nor was there even the slightest possibility that it could have been performed within one year. The trial court did not err in denying this instruction.[1]

■ Appellant next contends the trial court erred in refusing its instructions on promissory estoppel. Its objection to the refusal was:

"The Plaintiff objects to the refusal of Instructions 4, 5 and 6 and withdraws those instructions only because the Court had previously ruled in connection with directed verdict that promissory estoppel wasn't an element that he would submit in this case."

Appellant now cannot assign as error the failure to give the instructions. He withdrew them and they are no longer part of the record. Furthermore, the failure to give these instructions was not fundamental error as suggested by appellant.[2]

■ Appellant contends the trial court erred in failing to give its Instructions Nos. 24 and 25 which dealt with the legal requirements of a binding contract. We shall not consider No. 25 since the objection to the refusal was a general one. See Rule 51(a), Arizona Rules of Civil Procedure, 16 A.R.S. The refusal of No. 24 was not error as it was covered by the instructions given by the court.

■ At trial appellant presented alternative theories of recovery, breach of contract and restitution. It argued that even if the alleged oral agreement was unenforceable because of the statute of frauds, or otherwise, it would still be entitled to recover from ARCO the value of the motel and restaurant or, at the very least, the interest which it had to pay on loans of money used to construct the motel and restaurant. Appellant offered three instructions dealing with the subject of restitution of benefits. It contends the trial court erred in denying these instructions. We do not agree.

The Restatement of Contracts Secs. 347–357 (1932) deals generally with the subject of restitution and Sec. 355 specifically concerns contracts unenforceable because of the statute of frauds. A most lucid discussion of this subject is contained in *Dobbs*, Secs. 13.1–13.2 at 945–65.

For appellant to recover under the theory of restitution the appellee must have received a benefit, legal or actual. If a party receives a tangible economic gain from the performance of the other party it receives actual benefit. It may be that a party does not receive any economic gain as a result of a requested service yet the other party still can recover for the value of the service rendered. See Restatement of Contracts, Sec. 348. This is because he received a legal benefit, to-wit, the bargained for service. The rationale is that if a service is bargained for by one of the parties it is deemed to be of value to him even if it

---

1. The jury was also instructed that full performance by the plaintiff would take the oral agreement out of the operation of the statute of frauds. See *Waddell v. White*, 51 Ariz. 526, 78 P.2d 490 (1938).

2. On the issue of promissory estoppel and the statute of frauds, see *Tiffany, Inc. v. W. M. K.*

*Transit Mix, Inc.*, 16 Ariz.App. 415, 493 P.2d 1220 (1972) and Dobbs, Handbook on the Law of Remedies, Sec. 13.2 at 963–964 (1973). See also Annot. 56 A.L.R.3d 1037 (1974) wherein *Trollope v. Koerner*, infra, is erroneously described as a promissory estoppel case.

produces no objective gain. *Dobbs* at 957. In *Trollope v. Koerner*, 106 Ariz. 10, 470 P.2d 91 (1970) a landlord made significant improvements to suit the potential lessee in anticipation of a lease. The court held that the statute of frauds did not preclude the landlord from recovering the expense of such improvements to the extent that they were to be exclusively beneficial to the potential lessee.[3] Here, however, ARCO had not received an actual or legal benefit. No part of the motel or restaurant was ever intended to be for the exclusive benefit of ARCO as was the case in *Trollope*. Under the products agreement NSC had to buy only 50% of its products from ARCO and at the end of the contract term, NSC did not have to buy any products from ARCO. ARCO had no right to use the motel and restaurant apart from that granted to the general public. It would be a gross distortion of the facts to say that NSC built the motel and restaurant for ARCO.

Furthermore, since the results of the labor and improvements belonged to NSC, there can be no remedy by way of restitution. Restatement of Contracts Sec. 348, Comment *c*, and Sec. 355, Comment *d*, Illustration 2 (1932).

Affirmed.

RICHMOND, J., and LLOYD FERNANDEZ, Superior Court Judge, concur.

NOTE: Judge JAMES D. HATHAWAY having recused himself in this matter, Judge LLOYD FERNANDEZ was called to sit in his stead and participate in the determination of this decision.

---

**3.** *Trollope v. Koerner*, supra, relies on *Minsky's Follies of Florida, Inc. v. Sennes*, 206 F.2d 1 (5th Cir. 1953). It should be observed that *Minsky's* allowed recovery for services that were not even requested and in that sense goes beyond the general concept of a benefit and is in truth and in fact a case involving the allowance of reliance losses. See *Dobbs* at 957.