Linda S. KAHN, Plaintiff–Appellant,

v.

ROYAL BANKS OF MISSOURI and Farrell Kahn,
Defendants–Respondents.

No. 57032.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 29, 1990.

Rexford H. Caruthers, Martha L. Goodloe, Michael A. Vitale, Eugene J. Brockland, Jr., Sidney Stone, Steven Stone, St. Louis, for plaintiff-appellant.

Terrence Finan Moffitt, John A. Klobasa, Alan C. Kohn, St. Louis, for defendants-respondents.

SATZ, Presiding Judge.

This case concerns liabilities arising from two promissory notes executed in April, 1987 and made payable to the Royal Banks of Missouri (Bank). The trial court found Mrs. Linda Kahn (wife) and Mr. Farrell Kahn (husband) jointly liable on the notes and awarded the Bank the full amount of an injunction bond which the wife had posted as security for a temporary restraining order issued against the Bank. We affirm in part and reverse in part.

We review this court tried case under the well known principles established by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) and Rule 73.01(c). We defer to the credibility determinations made by the trial court, and we accept as true the evidence and permissible inferences favorable to the prevailing party and disregard contrary evidence and inferences. *E.g., Snowden v.*

*Gaynor,* 710 S.W.2d 481, 483 (Mo.App. 1986).

The husband and wife were married in 1959. From the beginning of the marriage, the husband assumed exclusive responsibility for the couple's business affairs, including millions of dollars' worth of oil and real estate investments, and continued to do so throughout the marriage. In 1979, the wife executed two separate powers of attorney: a "durable" power of attorney and a general power of attorney to convey real estate. In the durable power of attorney, she granted the husband broad authority, including the power on her behalf "to borrow money and to pledge . . . securities or mortgage . . . real estate for such loans if [in his] . . . judgment . . . such action should be necessary. . . ." In the other power of attorney, she authorized the husband, on her behalf, to "mortgage or otherwise purchase or convey any oil and gas leases or any part or all of the real estate or personal property now owned or hereafter acquired by [her]. . . ."

In April, 1987, the husband signed both his and his wife's names to two renewal notes approximating $1,400,000.00 and made payable to the Bank. The husband pledged jointly owned stock and real estate as collateral for the notes. The notes and pledge were part of one written agreement. The Bank declared the notes in default after they were not paid on time, and the Bank informed the husband and wife of its intention to sell the collateral to satisfy the notes.

The wife then filed the present declaratory judgment action against the Bank and the husband, seeking a declaration that the husband was solely liable on the notes and that the Bank had no interest in the wife's share of the jointly owned property pledged as collateral. At the wife's request, the trial court issued a temporary restraining order prohibiting the Bank from attempting to foreclose on the wife's interest in the collateral.

The husband filed a counterclaim seeking a declaration that his wife and he were jointly liable on the notes and that the pledge of the jointly owned property as collateral was valid. The Bank filed a counterclaim against the wife and a cross-claim against the husband seeking, in each claim, a declaration that the husband and wife were jointly liable on the notes and that the Bank had a valid security interest in the pledged collateral.

The trial court found the husband and wife to be jointly liable on the notes and also found the jointly owned collateral to have been validly pledged. Accordingly, the court entered a judgment in favor of the Bank and against the wife and husband in the amount of $1,543,002.60, constituting principal and interest. The court also awarded the Bank damages caused by the temporary restraining order. This appeal by the wife followed.

The wife makes several arguments on appeal. Their basic thrust is that the husband's signing of his wife's name to the 1987 notes did not make the wife an obligor on those instruments. The dispositive issues raised by these arguments focus on the validity of the husband's acquisition, retention and exercise of the 1979 powers of attorney empowering him to act on her behalf.

The wife contends the durable power of attorney was void from the outset because it was part of her husband's scheme to defraud his creditors by transferring his assets to her, in violation of Missouri's Fraudulent Conveyance Statute, § 428.020.[1] As a corollary, the wife argues the court erred in excluding parol evidence of her husband's alleged scheme.

■■■ Parol evidence, like any other evidence, can be admitted only if relevant to a material issue. *See Matter of Estate of Passman,* 537 S.W.2d 380, 386 (Mo. banc 1976). The material issue here is whether the husband's signing of his wife's name was valid insofar as the Bank, a third party, is concerned. Fraudulent conveyances are void against creditors; they are, nevertheless, " 'valid as against the grantor and his privies. . . .' " *E.g. Loe v. Downing,* 325 S.W.2d 479, 482 (Mo.1959).

1. All statutory references to RSMo 1986, unless otherwise indicated.

■ The wife is not her husband's judgment creditor, nor does she claim to be one. More important, perhaps, the wife's offer of proof seemingly implies she would testify that she knew of her husband's alleged scheme. Therefore, she clearly has no standing under the Fraudulent Conveyances Statute to question her husband's authority to act on her behalf, insofar as the Bank is concerned.

■ The wife next argues the durable power of attorney executed in 1979 had expired prior to the execution of the 1987 notes. The wife did not formally revoke the durable power of attorney until 1988. She notes, however, that this power of attorney had no express termination date, and she argues that the power of attorney terminated by operation of law before her husband used it in 1987. We disagree.

■ An agent's authority under an agency agreement of indefinite duration does terminate at the end of a "reasonable period." Restatement (Second) of Agency, § 105 (1957) [2]; *see also* 3 *Am Jur* 2d *Agency* § 37 (1986). The reasonable duration of an agent's authority depends on such factors as "the nature of the acts specifically authorized, the formality of the authorization, [and] the likelihood of changes in the purposes of the principal." Restatement, § 105, Comment b. "Authority may be kept alive beyond what otherwise would be a reasonable time by the fact that the principal knows that the agent is continuing to make efforts to perform and acquiesces therein." *Id.*

In the present case, it was reasonable for the husband to believe the durable power of attorney authorized him to act as his wife's agent as long as they were married. While all-encompassing, the durable power of attorney executed in 1979 merely formalized the authority which the husband had in fact been exercising from the date of the marriage in 1959, a 20 year period. According to wife's own testimony, husband had handled the couple's business affairs from the inception of the marriage. The couple had regularly borrowed money to invest in millions of dollars' worth of oil properties and real estate.

The 1987 notes at issue here are the culmination of a series of renewal notes securing long-standing indebtedness. The wife personally signed some of the renewal notes. More important, the wife acquiesced in her husband's execution of the 1987 notes on her behalf: the husband testified that he had informed the wife that he was signing her name to the 1987 notes. The wife concedes that she never told the husband not to sign her name to documents until 1988, when she instituted proceedings to terminate their marriage. These facts show that the durable power of attorney did not terminate by operation of law before the 1987 transactions in issue here.

However, the wife also contends that even if the durable power of attorney was in effect in 1987, the husband's signing of his wife's name to the 1987 notes was a breach of the fiduciary duty he, as the agent, owed his wife, as the principal, because he signed her name for his own benefit. This breach, the wife apparently reasons, precluded the husband from binding the wife to the Bank on the 1987 notes. The wife's apparent reasoning is a free leap justified by neither logic nor law.

■ Principals and agents do stand in a fiduciary relationship, which obligates an agent "to be perfectly frank with [his principal], to make full disclosure of all material facts, to strictly avoid misrepresentation ..., and in all respects to act with the utmost good faith, fidelity and loyalty in the interest of [the principal]." *Groh v. Shelton*, 428 S.W.2d 911, 916 (Mo.App. 1968). An agent who acts for a purpose unrelated to the principal's welfare violates this duty of loyalty, which requires an agent to place his principal's interest above all others, including the agent's. *See Utlaut v. Glick Real Estate Co.*, 246 S.W.2d 760, 763 (Mo.1952). Thus, when an agent is authorized to borrow money on his principal's behalf, "it is inferred that the agent is authorized to borrow only for the purposes of the principal, and the power of attorney, given for the benefit of the princi-

---

**2.** All Restatement references are to Restatement (Second) of Agency.

pal, is so interpreted, even though expressed in the broadest terms." Restatement, § 75, Comment d.

■ Obviously, then, an agent has no actual authority to act in violation of his fiduciary duties. However, if we assume, as the wife does for the purpose of this point, that the durable power of attorney authorized borrowing for their joint benefit, then, the husband had at least apparent authority to obtain the 1987 loans, even if husband had breached his fiduciary duties.

■ Apparent authority results from a manifestation by a principal to a third party that an agent for the principal is authorized to do certain acts. *Barton v. Snellson*, 735 S.W.2d 160, 162 (Mo.App. 1987). The manifestation from the principal to the third party need not be direct:

> The 'holding out' of the agent's authority by the principal party may be by action or inaction. The principal may directly communicate the authority to a third party or knowingly permit the agent to exercise such authority. *Hamilton Hauling, Inc., v. GAF Corp.*, 719 S.W.2d 841, 846 (Mo.App.1986).

Apparent authority exists only to the extent that a third party dealing with an agent actually and reasonably believes that the agent possesses the authority held out by the principal. *Id.*

■ Thus, as long as an agent intends to act for his principal's benefit, the agent has actual authority to borrow, and he would have authority to represent to a third party that he was so authorized, which, in turn, would create apparent authority. Moreover, authorizing an agent to do certain acts may create apparent authority in the agent to perform unauthorized acts of a similar nature.

> Permitting another to do a series of acts which can be reasonably interpreted as creating authority to continue to do similar acts, is a fruitful source of apparent authority. In some of the cases, the initial authority of an agent has terminated but not the apparent authority as to those who knew of the previous relation. Seavey, *Agency*, § 22, p. 44 (1964).

The apparent authority created while an agent authorized to borrow money intends to act for his principal's benefit may therefore outlast the agent's actual authority. "[T]he revocation of the authority of an agent takes effect as to [innocent] third persons only from the time the revocation is made known to them." *Brannaker v. Transamerican Freight Lines, Inc.*, 428 S.W.2d 524, 531 (Mo.1968).

■ Here, the husband testified that he may have presented the durable power of attorney to the Bank as early as 1979 and that he definitely gave the Bank a copy of that power in 1981. The evidence presented at trial, viewed in the light most favorable to the verdict, showed that it was reasonable for the Bank to assume that the husband retained that authority until and unless the wife revoked it. As long as the husband had not breached his fiduciary duties prior to apprising the Bank of the durable power of attorney, the husband retained apparent authority to obtain loans from and to pledge his wife's collateral to the Bank until she communicated revocation of the power of attorney to the Bank. As previously noted, the wife concedes that she did not communicate revocation of the durable power of attorney to the Bank until after the 1987 transactions.

Even if we were to assume that the husband had formulated an intent to breach his fiduciary duties to the wife before ever manifesting to the Bank that he had authority to act on his wife's behalf, the husband retained "inherent agency power" to act as his wife's agent. Admittedly, "apparent authority cannot be based upon an agent's unauthorized claim of authority." *Henry v. Cervantes–Diversified & Associates*, 700 S.W.2d 89, 92 (Mo.App. 1985). So, if an agent decides to borrow money for his own benefit, he has no actual authority to borrow; nor would the agent have any authority to represent to a third party that he had authority to borrow, which representation could be the basis of apparent authority. Nonetheless, the agent could still bind his principal to the third party by "inherent agency power."

The term, "inherent agency power," was first used in the Restatement (Second) of Agency, § 8A, to explain the power of an agent to bind the principal to a third party where the agent "who conducts the transaction has neither [actual] authority nor apparent authority and there are no estoppel elements." Seavey, *supra*, at § 8F, p. 15. The term is used in the Restatement

> to indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent. Restatement, § 8A.

Thus,

> A disclosed or partially disclosed principal is subject to liability upon a contract purported to be made on his account by an agent authorized to make it for the principal's benefit, although the agent acts for his own or other improper purposes, unless the other party has notice that the agent is not acting for the principal's benefit. Restatement, § 165.

The creation or recognition of this power is based upon a perceived commercial need. Seavey observes that "it is not unfair to place the risk of the agent's honesty upon the principal, since [the principal] has the opportunity of investigating the agent before entrusting him with his affairs, and in the long run this result inures to the benefit of employers [and other principals], whose interests require that they should guarantee the honesty of agents to those doing business with them." Seavey, *supra.* at § 61A; *See also*, Restatement, § 161, Comment a.

Our courts have referred to the concept of inherent agency power, neither adopting or rejecting it. *Reeves v. Jones,* 416 S.W.2d 952, 956 (Mo.1967); *Sturgeon v. State Bank of Fisk,* 616 S.W.2d 578, 584 (Mo.App.1981). A number of other jurisdictions have expressly adopted the concept. *E.g. Nogales Service Center v. Atlantic Richfield Co.,* 126 Ariz. 133, 613 P.2d 293, 296 (Ariz.App.1980); *Cote Bros., Inc. v. Granite Lake Realty Corp.,* 105 N.H. 111, 193 A.2d 884, 885 (1963); Restatement, Appendix, § 8A. Quite often its existence has been concealed "by basing the liability on apparent authority, even in cases in which it was obvious there was no appearance of authority, or upon an expanded idea of estoppel." *Seavey, supra* at p. 105. To us, the concept makes good commercial sense and is applicable here.

Since the Bank had no knowledge that the husband may have been acting in violation of his fiduciary duties and therefore beyond his authority, the husband had inherent agency power to deal with the Bank on his wife's behalf. Even if the husband did breach his fiduciary duties as his wife's agent, she, as principal, would still be liable to the Bank, a third party dealing in good faith with her ostensible agent.[3]

██ The wife also argues she was not liable on the 1987 notes because her husband did not indicate he was signing her name in his representative capacity. The wife contends that both the Uniform Commercial Code, as adopted in Missouri, and the common law regarding durable powers of attorney, as recently codified by statute, absolve her, a principal, of liability under such circumstances. Again, we disagree.

Missouri's Commercial Code provides that "no person is liable on an instrument unless his signature appears thereon." § 400.3-401(1). A principal's "signature may be made by an agent or other representative, and [the agent's] authority to make it may be established as in other cases of representation." § 400.3-403(1). A principal is thus liable on an instrument to which his signature is affixed by an authorized agent. Nevertheless, the wife insists that Comment 2 to § 400.3-403 absolves a principal of liability for commercial paper to which an authorized agent signs

---

**3.** Since inherent agency power is not a privileged power, an agent's wrongful exercise of such power does not prevent a principal from seeking recourse against the agent. Thus, if the husband's actions did, in fact, breach his fiduciary duty to his wife, his actions would not be privileged with respect to his wife, the principal. We express no opinion concerning whether the husband actually violated his fiduciary duty as his wife's agent.

the principal's name without revealing the agent's representative capacity.

The wife's argument takes the Comment on which it depends completely out of context. Section 400.3–403(2) concerns the consequences of an agent's signing *his own name* to an instrument without revealing both the existence and identity of his principal. The statute provides

an authorized representative who signs *his own name* to an instrument

(a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;

(b) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity. 400.3–403(2) (emphasis added).

Comment 2 to § 400.3–403 indicates the agent may be solely liable under certain circumstances: "even though [the agent] is authorized the principal is not liable on the instrument under the provisions (Section 3–401) relating to signatures, unless the instrument names [the principal] and clearly shows that the signature is made on his behalf." Comment 2 is simply a straightforward application of § 400.3–401: a principal cannot be liable on an instrument to which an agent signs only the agent's name because the principal's signature does not appear on the instrument.

This analysis is entirely consistent with the objective of § 400.3–403, which is to promote the certainty of commercial transactions by enabling the holder of commercial paper to " 'tell at a glance' whose obligation he holds." Anderson, *Uniform Commercial Code* § 3–403:3 (1984). A holder may readily conclude that a principal is obligated on an instrument if the instrument *contains* either the principal's signature by an authorized representative or an agent's signature accompanied by revelation of the agent's representative capacity and the principal's identity. Absolving the wife, as principal, of liability on an instrument to which her authorized agent, her husband, affixed her name would only impede the certainty of commercial transactions.

Missouri's new Durable Power of Attorney Statute, §§ 404.700–404.735 RSMo 1989, adds an additional degree of certainty to commercial transactions by requiring that "an attorney in fact acting for the principal under a power of attorney shall clearly indicate his capacity ..." § 404.712.1. The statute's apparent requirement that even an agent authorized to sign for his principal must reveal his representative capacity did not exist under the prior Durable Power of Attorney Statutes, §§ 486.550–486.595 RSMo 1986.

However, even if we were to accept the wife's contention that the new Durable Power of Attorney Statutes merely codifies pre-existing common law, the wife would not be absolved of liability to the Bank. The obvious purpose of the new statutory requirement that agents always reveal their representative capacity is to let third parties know with whom they are dealing. This purpose is served whenever a principal's name appears on an instrument, even if an agent has signed the principal's name without revealing the agent's representative capacity. Notwithstanding any liability which an agent might have under our new Durable Power of Attorney Statutes, a principal whose name has been affixed to a commercial paper by an authorized agent is personally liable on that instrument under §§ 400.3–401 and 400.3–403(1). Therefore, the husband's failure to indicate his representative capacity on the 1987 notes did not affect wife's liability on those instruments.

Finally, we address the wife's contention that even if she is liable on the 1987 notes, the trial court erred in awarding the Bank the full $100,000 amount of the injunction bond and a collateral assignment agreement posted by the wife.

At the wife's request, the trial court issued a temporary restraining order on De-

cember 20, 1988 prohibiting the Bank from attempting to foreclose on the wife's interest in the collateral. The wife filed an injunction bond in the amount of $25,000 and agreed to post an additional bond in the event of a decline in the market value of the stock pledged as collateral. The wife and the Bank subsequently entered into a "collateral assignment agreement," devised as an alternative method for protecting the Bank against the possibility of a decline in the price of the stock pledged as collateral. Under the terms of this agreement, the wife assigned to the Bank a security interest in a $75,000 certificate of deposit in order to cover any damages caused by the temporary restraining order in excess of the $25,000 injunction bond.

Before considering the merits of the wife's contention, that the damages on the bond were improper, we must address two procedural arguments made by the Bank. The Bank first argues that wife's appeal of this portion of the judgment was untimely. We disagree.

On May 19, 1989, the trial court entered an order for the Bank in which it dissolved the temporary restraining order and set a June 9 date for a hearing on the Bank's damages as a result of the temporary restraining order. The court also stated that at the June 9 hearing additional interest up to that time would be computed.

 Appeals lie only from final judgments "leaving nothing for future determination." *Sinopole v. Morris,* 735 S.W.2d 194, 195 (Mo.App.1987). By its very terms, the May 19 order reserved decision on the amount of damages caused by imposition of the temporary restraining order as well as the computation of the interest. Thus, the judgment against the wife did not become final until damages were actually assessed on June 14, and the wife's notice of appeal filed within ten days of that date was timely. Rule 81.04(a).

The Bank also argues that the wife's appeal of this portion of the judgment was not preserved for review because the "statement of facts" portion of wife's appellate brief did not comply with Rule 84.-04(c). We have read the wife's brief. It does meet the requirements of Rule 84.-04(c). We therefore consider this point on its merits.

 The measure of damages recoverable on an injunction bond is the amount necessary to compensate a defendant for losses directly caused by the restraint, while it is in force. *Collins & Herman, Inc. v. St. Louis County,* 684 S.W.2d 324, 326 (Mo. banc 1985). Damages "occasioned by the [underlying] suit independent of the injunction" are not recoverable from the proceeds of an injunction bond. *C.H. Albers Commission Co. v. Spencer,* 236 Mo. 608, 139 S.W. 321, 326 (1911). The party seeking damages has the burden of proving loss which is the direct result of the issuance of the restraining order. *Economy Gas Co. v. Bradley,* 472 S.W.2d 878, 879 (Mo.App.1971).

 The trial court included the principal and interest due on the 1987 notes in its calculation of the Bank's damages on the injunction bond and collateral assignment agreement. The trial court itemized the Bank's damages from the temporary restraining order as follows: $14,495.00, attorney's fees; $229.95, deposition expenses; $1,199,425.83, principal and interest due on one note, $1,144,185.54 principal and $55,-240.29 interest; and $261,969.17, principal and interest on the other note, $250,000.00 principal and $11,969.17 interest. Although not expressly stated in the order, the court apparently was referring to the interest which had accrued before the date of the temporary restraining order, December 20, 1988. The court awarded the Bank "the total sum of $100,000, the amount of [the Bank's] damages covered by said injunction bond and Collateral Assignment Agreement."

The trial court erred in including the principal and interest due on the notes in its computation of Bank's damages resulting from the temporary restraining order. The issuance of that order did not cause those damages.

The wife does not dispute that the Bank's attorney's fees and deposition expenses are proper elements of damages

resulting from the temporary restraining order. The wife only challenges the propriety of including the principal and interest due on the notes. According to the wife, on the date when the temporary restraining order issued, December 20, 1988, there was $67,209.46 in interest due on the two notes. The wife contends that, in addition to its attorney's fees and court costs, the Bank's damages consisted, at most, of the lost opportunity to earn interest at the legal rate of 9% on the amount of interest due as of the date when the restraining order issued. According to the wife's computations, that amount is less than $3,000 for the period when the restraining order was in effect. We disagree.

Section 408.040.1 provides that contractual judgment debts bear interest at either the legal rate of 9% or the contract rate, whichever is greater.[4] Therefore, upon dissolution of a restraining order enjoining collection of a money judgment, " 'interest thereon at the legal rate, for the time the money is impounded, may be recovered by way of damages.' " *Terminal Railroad Ass'n of St. Louis v. Schmidt*, 353 Mo. 79, 182 S.W.2d 79, 84 (1944). However, the legal rate of interest applicable to judgment debts has no bearing upon determination of damages caused by a temporary restraining order when, as here, the order did not enjoin collection of a money judgment.

■■■ More relevant, perhaps, " 'when the collection of a judgment has been enjoined [, damages] ... should be computed upon the aggregate amount of principal, interest and costs due at the time the injunction took effect.' " *Id.* at 84–85. Accordingly, if the issuance of a temporary restraining order does deprive a prevailing party of the opportunity to collect interest in excess of the contract rate on a contractual debt, then the prevailing party's damages should include the excess of the higher interest rate over the contract interest

rate on the amount of principal *and* interest due on the date when the restraining order issued, for the time that the order remained in force.

The Bank's argument in support of the trial court's assessment of damages on the bond is also not persuasive. The Bank relies on *Terminal Railroad, supra,* for the proposition that the principal and interest due on the notes as of December 20, 1988, when the temporary restraining order issued, constitute an appropriate element of damages caused by that order. The Bank's reliance is misplaced.

In *Terminal Railroad,* collection of a $40,000 judgment had been enjoined. In awarding damages upon dissolution of the injunction, the court allowed not only interest on the principal due when the restraining order issued, but also interest at the legal rate on the accumulated interest due on the judgment as of the time when the restraining order was imposed. 182 S.W.2d at 84. As the court explained, the prevailing party was entitled to interest on the "sum due the day the injunction was issued[,]" including interest which had accrued prior to the injunction. *Id.* Thus, the Court neither held nor implied that a prevailing party may recover, as damages for the wrongful issuance of a restraining order, principal and interest due on the date when the order issued. Rather, it held that damages may include interest computed upon the sum of principal and interest due on the underlying debt as of the date when the restraining order took effect.

In the present case, the Bank has not shown that, but for the issuance of the temporary restraining order, it would have earned interest in excess of the rate provided in the notes. *Economy Gas Co., supra,* at 879. The Bank is therefore limited to the other items of damage found by the

---

**4.** Section 408.040.1 provides in full:

Interest shall be allowed on all money due upon any judgment or order of any court from the day of rendering the same until satisfaction be made by payment, accord or sale of property; all such judgments and or-

ders for money upon contracts bearing more than nine percent interest shall bear the same interest borne by such contracts, and all other judgments and orders for money shall bear nine percent per annum until satisfaction made as aforesaid.

trial court: attorney's fees and deposition expenses, totalling $14,724.95.

We affirm the trial court's judgment for the Bank and against both the husband and the wife in the amount of $1,543,002.60, representing both principal and interest due on the two notes as of the date of judgment. We also affirm the award of attorney's fees and deposition expenses as compensation for damages which the Bank incurred as a result of the temporary restraining order. The inclusion, as damages, of the principal and interest due on the notes as of December 20, 1988, when the temporary restraining order issued, is reversed.

SMITH and GRIMM, JJ., concur.