**NEWCOURT FINANCIAL USA, INC., et al., Respondent,**

v.

**LAFAYETTE INVESTMENTS, INC., d/b/a Mid Am Truck Center, Inc., Appellant.**

**No. WD 55396.**

Missouri Court of Appeals, Western District.

Submitted Oct. 8, 1998.

Decided Jan. 12, 1999.

Robert P. Smith, Kansas City, MO, for appellant.

Stephen M. Ryan, Kansas City, MO, for respondent.

Before ULRICH, P.J., SMART and EDWIN H. SMITH, JJ.

SMART, Judge.

Lafayette Investments, Inc. ("Lafayette") appeals the circuit court's judgment denying its request for recovery against an injunction bond filed by Newcourt Financial USA, Inc. ("Newcourt"). Lafayette believes that it sustained its burden of proving that the temporary restraining order ("TRO") issued on behalf of Newcourt, caused it to sustain damages in the form of: (1) attorneys' fees incurred as the result of defending against the TRO; (2) storage costs for the collateral; (3) interest expense which accrued on the collateral; and (4) depreciation in the value of the collateral.

Judgment affirmed.

### Factual Background

Central States Truck Center, Inc. ("Central States") borrowed money from appellant Lafayette to purchase thirty-nine trucks under a security agreement executed by the parties. In order to finance the trucks' purchase, Lafayette, in turn, obtained loans from Hillcrest Bank. At the time of the trucks' acquisition, the original certificates of title were transferred to Lafayette, which then transferred the certificates of title to Hillcrest Bank. Hillcrest Bank maintained all certificates of title for all thirty-nine trucks.

Central States defaulted on its loan payments to Lafayette. Lafayette then took physical possession of the trucks on January 3 and 4, 1996, and arranged to sell them through a public auction, scheduled for on February 28, 1996. Prior to Central States' default, several individuals purchased six of the trucks from Central States. These individual purchases were financed by the respondent, Newcourt. Neither the purchasers nor Newcourt ever received the certificates of title for the six purchased trucks.

On February 22, 1996, six days prior to the public auction, Newcourt filed an action in the circuit court of Jackson County seeking a TRO prohibiting Lafayette from selling the six trucks which had already been paid for by Newcourt's borrowers. A hearing on Newcourt's petition was held on February 23, 1996. A TRO prohibiting Lafayette from selling the six trucks was entered on February 27, 1996. Lafayette then cancelled the public auction as to all thirty-nine trucks. At the request of Newcourt, the TRO was extended on March 14, 1996, and again on April 2, 1996. In its order extending temporary restraining order issued April 2, 1996, the circuit court set the matter for a hearing on May 3, 1996, and ordered Newcourt to file a substitute bond in the amount of $20,000.00. On April 2, 1996, Newcourt filed an injunction bond with the circuit court.

On March 26, 1996, Newcourt and the individual purchasers filed their first amended petition alleging they were buyers in the ordinary course of business under § 400.9–307, RSMo 1994.[1] On April 3, 1996, Lafayette filed its answer and counterclaim asserting that it, and not Newcourt or the individual buyers, was entitled to possession of the six trucks and asking for costs and attorneys' fees. Lafayette pointed out to Newcourt that Newcourt's claims for possession of the trucks would fail because its failure to procure the certificates of title to the trucks at the time of their purchase precluded Newcourt from being a buyer in the ordinary course of business. Newcourt then filed documents in the circuit court dismissing its claims against Lafayette.

On April 29, 1996, the circuit court entered an order of partial dismissal which dismissed Newcourt's claims against Lafayette but reserved jurisdiction over Lafayette's counterclaim against Newcourt. The parties stipulated that Lafayette's counterclaim issues relating to costs and attorneys' fees would be tried by affidavits and briefs.

Lafayette stated that it cancelled the auction because, as a result of the TRO, several other parties formally asserted claims to various other financed trucks. Lafayette sent notices of sale to parties who had UCC fi-

---

1. All statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicated.

nancing statements filed against the financed trucks, and claimed that, prior to Newcourt's suit, none of them had formally asserted claims against the trucks. Lafayette further claimed that, but for Newcourt's claim and the TRO, the auction would have been conducted on February 28, 1996, as planned. Lafayette originally attributed the following expenses and costs to the Newcourt's claim and the TRO:

| EXPENSE | AMOUNT |
| --- | --- |
| Attorneys' fees incurred as a direct result of defending Lafayette's possession of the trucks and having the TRO dissolved. | $18,055.75 |
| Storage costs calculated at $1.50 per day for each truck. Each truck was stored for sixty-two days. Five of the six trucks in question were stored during the proceedings. | $ 465.00 |
| Transportation costs for retrieving the sixth truck, which was abandoned by its purchaser in Louisiana upon Newcourt's dismissal of its action against Lafayette. | $ 3,515.20 |
| Interest expense owed to Hillcrest Bank from the financing of the six trucks, calculated at 9.5% per annum. | $ 2,869.16 |
| Depreciation in the value of the trucks during the sixty-two days their disposition was restrained. | $22,225.00 |
| The cost of the aborted auction, attributed to the six trucks in question. | $ 8,153.84 |
| TOTAL EXPENSES CLAIMED | $55,283.95 |

However, at the hearing on May 3, 1996, Lafayette abandoned its claims for damages relating to the transportation costs for retrieving the truck in Louisiana and the aborted auction costs, resulting in claimed damages of $43,614.91, which Lafayette requested against the $20,000.00 injunction bond Newcourt posted.

On Lafayette's counterclaim for damages, the circuit court found in favor of Newcourt, denying Lafayette's request for recovery against the bond. Lafayette appeals, claiming as a matter of law, it is entitled to recover damages sustained as the result of wrongfully-issued and subsequently dissolved TRO.

### Standard of Review

The trial court's judgment will be sustained unless it is not supported by substantial evidence; it is against the weight of the evidence; or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). In a bench trial where the court makes no findings of fact with respect to a particular issue, we will resolve all factual issues according to the trial court's judgment. *Young v. Ray Am., Inc.,* 673 S.W.2d 74, 78 (Mo.App.1984). Moreover, we will support the trial court's judgment under any reasonable theory which is supported by the evidence. *Uelk v. Directory Distrib. Assoc., Inc.,* 803 S.W.2d 632, 634 (Mo.App.1991).

### Injunction Related Damages

It is well settled in Missouri that the dismissal of an injunction without the defendant's connivance amounts to a determination that the injunction was wrongfully obtained. *Kelder v. Dale,* 313 S.W.2d 59, 64 (Mo.App.1958); *see also Sullivan v. Winer,* 307 S.W.2d 704, 707–08 (Mo.App.1957). A party against whom an injunction has been wrongfully obtained is entitled to damages. *Boatmen's Nat'l Bank of St. Louis v. Cantwell,* 183 S.W.2d 397, 399 (Mo.App.1944). Our basis for compensating for injunction related damages is statutory. *See* § 526.070, RSMo 1994 (requiring a bond from which the plaintiff will pay "all sums of money, damages and costs ... adjudged against him if the injunction shall be dissolved."); § 526.200, RSMo 1994 (stating that "[u]pon the dissolution of an injunction, ... damages shall be assessed ..."); § 526.210, RSMo 1994 (providing "[t]he court shall enter judgment against the obligors in the bond, ... including the damages so assessed...."); *Collins & Hermann, Inc. v. St. Louis County,* 684 S.W.2d 324, 325–26 (Mo. banc 1985) (§§ 526.070, 526.200, 526.210 and R. 92.09 "provide the *only* basis for an assessment of damages arising from the issuance of an injunction." (emphasis added)). While at common law a plaintiff incurred no liability for a wrongfully-filed injunction if it was filed in good faith, there is no such exception for statutorily-posted bonds. *State ex rel. County of Shannon v. Chilton,* 626 S.W.2d 426, 430 (Mo.App.1981).

Recoverable damages are limited to the amount necessary to compensate for losses incurred as the "actual, natural and proxi-

mate result" of the injunction, while it is in effect. *Collins*, 684 S.W.2d at 326. Damages are further limited to the amount of the bond filed. *Stensto v. Sunset Mem'l Park, Inc.*, 759 S.W.2d 261, 267 (Mo.App.1988). Damages resulting from the underlying suit, rather than the injunction, are not recoverable from the proceeds of the injunction bond. *Kahn v. Royal Banks of Missouri*, 790 S.W.2d 503, 511 (Mo.App.1990).

■ Lafayette appeals to this court for damages relating to: (1) attorneys' fees incurred in defending against the TRO; (2) storage costs; (3) interest expense; and (4) depreciation. In order for Lafayette to recover damages relating to Newcourt's wrongfully-filed TRO, it must first prove that the damages it claims were actually, naturally and proximately related to the issuance of the TRO.

On January 3 and 4, 1996, Lafayette repossessed thirty-nine trucks from Central States and made plans to sell the repossessed trucks at a public auction on February 28, 1996. The total value of these trucks was $826,635.33. In an affidavit presented to the circuit court, Mr. Frank Wendt, counsel for Central States stated:

5. Beginning in late January 1996 and continuing in February, other creditors, including Mercantile Bank of Kansas City [ ], Bank of Odessa [ ], and Commercial Bank of Oak Grove [ ], communicated to me their claim of various liens in some or all of the trucks that had been repossessed from Central States or that were otherwise in the possession of Lafayette....

6. Beginning in late January 1996 and continuing in February, I periodically communicated with counsel for Mercantile, Odessa, Lafayette and Commercial Bank as they attempted to determine the validity, extent and priority of the various liens that were claimed by their clients and others.

On February 14, 1996, Lafayette received a letter from Mr. L. Michael Schwartz regarding the priority of claims relating to two trucks. Mr. Schwartz told Lafayette, "I just began my representation of Community Bank in this matter, and I am currently reviewing the documentation you provided as well as the documentation in my client's possession." Mr. Schwartz stated that he would contact Lafayette soon regarding Community Bank's claim of priority regarding trucks and asked that "[Lafayette] ... take no action concerning the sale of these trucks ..." until the priority issues were settled.

On Friday, February 16, 1996, Lafayette mailed a notice that the trucks were to be sold at auction on February 28, 1996. This notice was sent to all creditors who had filed UCC financing statements regarding the trucks. The notice stated that Lafayette had repossessed the trucks from Central States.

On February 22, 1996, Newcourt filed its petition in circuit court seeking a TRO with regard to six trucks. The value of these six trucks was $177,800.00. A hearing on the matter was held on February 23, 1996, and the TRO was entered on February 27, 1996, one day before the auction was to be held. The TRO specifically stated that it applied only to the six trucks in question. The order clearly did not purport to enjoin Lafayette from selling the remaining thirty-three trucks at auction as originally planned.

### Claims of Other Creditors

As already noted, beginning in late January, 1996, various creditors began asserting claims of security interests in the collateral. Some creditors claimed priority. Lafayette received a letter from an attorney for the Commercial Bank of Oak Grove, claiming a security interest in two trucks. That letter stated in pertinent part:

Lafayette Investments, Inc., d/b/a Mid–Am Truck Center was aware of these security interests. It is the position of the Commercial Bank of Oak Grove ... that Lafayette Investments is committing conversion by the sale of our collateral and the bank[ ] will look to Lafayette Investments for the damages.

The value of the two trucks in question was $75,000.00. Lafayette also received a letter from the Bank of Odessa claiming a perfected security interest in three trucks having a value of $54,000.00. Lafayette also received a phone call from Mercantile Bank of Kansas City claiming a perfected security interest in

the "inventory" of Central States, including all thirty-nine of the trucks in question. Mercantile Bank claimed that "[t]he conducting of this foreclosure sale would be subordinate to the perfected security interest of the Bank in inventory of Central States, which does include such tractor trucks, and would constitute a conversion of the Bank's property."

Lafayette cancelled the auction with regard to all thirty-nine trucks. On February 29, 1996, Mr. David Byrn, counsel for Lafayette, sent a letter to the banks stating:

> For your information, the trucks which were repossessed by Lafayette from Central States Truck Center, Inc. were not sold at auction on February 28, 1996.... [I]t appears the claims and arguments of *all* allegedly interested parties would be better resolved prior to disposing of the collateral.

(Emphasis added).

Lafayette claims that if it had not been for the TRO, the public auction would have taken place, and the other creditors would not have formally asserted priority claims against the thirty-nine trucks. The burden for proving these propositions was upon Lafayette. The trial court did not find that Lafayette sustained its burden of proof, and we must uphold this decision if it is supportable under any reasonable theory. *Uelk*, 803 S.W.2d at 634.

### An Issue of Causation

Beginning in mid-January, other Central States creditors were evaluating the priority of various claims against the trucks Lafayette repossessed. The week before the auction, Lafayette received notification from three creditors stating that they had perfected security interests in the trucks and if Lafayette continued with the auction, it would be subject to conversion claims by the banks. In fact, Lafayette never filed a financing statement with regard to the trucks.[2] Thus, Lafayette appeared to hold an unperfected security interest in the trucks, inferior

to those held by the banks. On February 27, 1996, Lafayette was not only facing the TRO regarding six trucks, it was also facing three potential conversion claims by creditors with purportedly superior security interests in the repossessed trucks, including the same six trucks that were the subject of Newcourt's TRO.

Lafayette claims that it is entitled to damages because the other creditors asserted claims only after the TRO was issued on behalf of Newcourt. However, the evidence shows that Lafayette knew that other creditors were researching the priorities of various security interests in the trucks. The notice of auction was sent on February 16, 1996, twelve days before the auction. The trial court could reasonably infer that the notice of upcoming auction of their collateral caused the creditors claiming a superior security interest to press Lafayette concerning their claims. Also, the February 29, 1996, letter of counsel for Lafayette refers to the wisdom of resolving the claims of interested parties before disposing of the collateral. Thus, we conclude that there was substantial evidence from which the court could have concluded that Lafayette cancelled the sale of the thirty-three trucks because of the issues related to the claims of security interests, and not because of the TRO. The court could reasonably have concluded that Lafayette wished to avoid further legal problems which would likely have been generated by proceeding with the sale. The trial court did not err in deciding that Lafayette failed to prove that its losses were caused in fact by the issuance of the TRO.

The trial court's judgment is supported by substantial evidence.

The judgment is affirmed.

ULRICH, P.J., and EDWIN H. SMITH, J., concur.

---

2. Lafayette claims that it was the owner of the trucks under the security agreement with Central States, so it was not necessary to file a financing statement. Apparently, under that agreement, legal title was held by Lafayette in trust, for the benefit of both Central States and Lafayette. However, the agreement which bestowed "ownership" of the trucks on Lafayette also granted it a security interest in the trucks.